1    LOUIS M. BUBALA III                                          *Electronically Filed*
     Nevada State Bar No. 8974                                      *August 4, 2020*
2    KAEMPFER CROWELL
     50 W. Liberty St., Ste. 700
3    Reno, NV 89501
     Telephone:  775.852.3900
4    Facsimile:  775.327.2011
     Email:  lbubala@kcnvlaw.com
5
     Attorneys for Creditor
6    Geo-Logic Associates, Inc.

7                    UNITED STATES BANKRUPTCY COURT

8                          DISTRICT OF NEVADA

9    In re                                    Case No. 20-50660-btb
                                              Chapter 7
10   METAL RECOVERY SOLUTIONS, INC.,
     aka MRS, INC.,                           **MOTION TO DISMISS CASE**
11                      Debtor.
                                              **[REDACTED, FILED PUBLICLY]**
12
                                              Hearing Date:  9/1/2020
13                                            Hearing Time:   2:00 p.m.

14          Geo-Logic Associates, Inc. ("GLA") moves to dismiss this case for cause. This is a two-

15   party dispute between (1) GLA and (2) Debtor Metal Recovery Solutions, Inc. ("MRS"); its

16   owners, Dr. Thomas and Jette Seal; and Differential Engineering, Inc., also owned by Dr. Seal.

17          GLA is the largest creditor with a $2.2-million judgment. The second largest creditor,

18   Differential (owned by Dr. Seal), allegedly is owed $1.7 million. It received security interests

19   from MRS during the underlying GLA-MRS dispute. The third largest creditor is Brownstein

20   Hyatt, litigation counsel for MRS, Differential, Dr. Seal and Mrs. Seal. There are three other

21   creditors in this case. They are owed less than $2,300, or 1/20th of 1 percent of debtor's

22   scheduled debt of $3.3 million.

23          GLA spent more than two years in arbitration and litigation before getting a judgment.

24   MRS refused to pay. GLA filed a second action against Differential and the Seals, pending in the

1    U.S. District Court, alleging they are alter egos of MRS and received fraudulent transfers and

2    illegal equity distributions. GLA has identified more than $2.2 million paid by MRS during

3    arbitration to the Seals and Differential. This is the money they should have used to pay GLA.

4    The trustee has tried to persuade GLA to proceed through the bankruptcy. GLA has

5    listened but believes dismissal is the best outcome. The basis for any claims brought by the

6    trustee already has been brought by GLA—and GLA is the only beneficiary if the claims

7    succeed, whether brought by GLA or the trustee. These claims should not be brought by the

8    trustee, who has a steep learning curve, depletes the estate with administrative claims, and has

9    discretion to resolve this for far less than GLA's debt. The Seals ultimately benefit from the

10   trustee's prosecution. GLA requests this case be dismissed so it can resume its own prosecution

11   against the Seals, Differential and MRS.

12   **MEMORANDUM OF POINTS AND AUTHORITIES**

13   **I. FACTUAL BACKGROUND**

14   The facts are initially drawn from the record in the original litigation, *Geo-Logic Assocs.,*

15   *Inc. v. Metal Recovery Solutions, Inc.*, No. 3:17-cv-00564-MMD-WGC (D. Nev.) ("*GLA I*"), and

16   the underlying arbitration, *Geo-Logic Assocs., Inc. v. Metal Recovery Solutions, Inc.*, No.

17   1260004635 (JAMS Nev.) ("Arbitration"). There is a second action pending to recover on the

18   judgment in *GLA I. Geo-Logic Assocs., Inc. v. Metal Recovery Solutions, Inc.*, No. 3:20-cv-

19   00180-MMD-WGC (D. Nev. filed March 20, 2020) ("*GLA II*").

20   **1.   A broken contract produced three years of litigation and a judgment against MRS**

21   MRS was hired by a gold mine developer in Mexico in 2015. MRS lacked the necessary

22   staff, so it hired GLA, "a geologic, geotechnical, civil, and environmental firm with more than

23   250 geologists, engineers, and staff located in 25 offices across eight States and an affiliate office

24   in Lima, Peru." After MRS and GLA reached an agreement on performing work together on

**KAEMPFER CROWELL**
50 West Liberty Street, Suite 700
Reno, Nevada 89501

1   Phase 3 and GLA performed substantial work, MRS decided it could make more money without

2   GLA and refused to honor the parties' agreements. In 2017, GLA sued MRS for excluding it

3   from the project and breaching the parties' contract. The parties agreed to Arbitration before

4   Hon. Philip M. Pro (ret.). GLA narrowed its claims against MRS; MRS brought counterclaims.

5   The case involved extensive discovery, pre-trial motion practice, and motions for summary

6   judgment. Judge Pro conducted the Arbitration from May 28-31, 2019. Post-hearing briefing was

7   complete on July 30, 2019. Judge Pro entered his Award in GLA's favor on August 31, 2019,

8   and a Final Award to correct typographical errors on September 21, 2019. This is drawn from

9   **Exhibit 1**, the Final Award. Judge Pro agreed that MRS made approximately $6 million in net

10  profit on Phase 3, a number that Dr. Seal has admitted to under oath,[1] and that GLA was entitled

11  to 30 percent of that as damages for the breach of contract. *Id.*

12          GLA moved for confirmation, and MRS moved for vacation (*GLA I*, Dkt. 25, 30). Chief

13  Judge Du agreed with GLA and entered judgment. **Exhibits 2-3**, Order and Judgment. The

14  balance due from MRS to GLA was $2,206.803.60 on April 3, 2020. **Exhibit 4**, Writ. MRS

15  appealed. The district court denied its motion to stay execution, and MRS did not post a bond

16  (*GLA I*, Dkt. 84). MRS' appeal is scheduled for oral argument October 15, 2020. *Metal Recovery*

17  *Solutions, Inc. v. Geo-Logic Assocs., Inc.*, No. 20-15157 (Notice, 9th Cir. August 2, 2020).

18  ///

19  ///

20  ///

21  ///

---

22  [1] Dr. Seal admitted at the arbitration hearing that ███████████████████

23  ███████████. **Exhibit 12**, Excerpt from 5/29/19 Arbitration Tran. at 441:23-443:4.  During the post judgment debtor's examination, Dr. Seal admitted MRS' net ███████████████████████████████████

24  Exhibit 6, 3/3/20 T. Seal Trans. at 58:13-59:20, ████████████████████████████████████████████████

███████████████████████████. *Id.* at 59:4-11. He appears to misunderstand the rights of
shareholders to payments as equity distributions if the company makes a profit.

1      **2.   When MRS refused to pay the judgment, GLA looked at the Seals and Differential**

2         **a.   Dr. Seal claims to have developed the mining technology, but he has transferred**

3              **ownership to MRS and Differential, both entities that he owns**

4         Dr. Seal has a doctorate in mining engineering and is a faculty member at the University

5   of Nevada. **Exhibit 5**, 5/31/18 T. Seal Dec. at ¶2. He claimed to have developed "Hydro-Jex," a

6   mining technology used at the mine in the GLA-MRS dispute. *Id.* at ¶3.

7         Dr. Seals' representations about the technology have varied over time. ███████████

8   ██████████████████████████████████████████████████████████. *Id.* at

9   ¶7. ███████████████████████████████████. *Id.* at ¶18. ███████████

10  ███████████████████████████████████████████████

11  ███████████████████████. *Id.* at ¶¶4, 8 & 18. ████████████████████

12  ███████████████████████████████. *Id.* at ¶17.

13        At the end of the litigation, Dr. Seal's statements differed. ██████████████████

14  █████████████. **Exhibit 6**, 3/3/20 T. Seal Trans. at 71. Additionally, MRS only owned two

15  Hydro-Jex trailers (Bk. Dkt. 1, Sch. B). ██████████████████████████████

16  ███████████. Ex. 6, Trans. at 69. ████████████████████████████████████

17  █████████████████████████████████████. *Id.* at 69-71.

18        **b.   The Seals, as the sole owners of MRS, dominate its decision-making**

19        Dr. Seal owns 95 percent of MRS and is president, chief executive officer and director

20  (Bk. Dkt. 1, SOFA ¶28; Ex. 6, Trans. at 8). Mrs. Seal owns 5 percent of the company, serving as

21  secretary, treasurer and director (Bk. Dkt. 1, SOFA ¶28). ██████████████████████

22  ███████████████████████. Ex. 6, Trans. at 16-17, 51.

23        Dr. Seal became the sole owner of MRS in 2012 when other shareholders did not make

24  their capital contributions. *Id.* at 13. Mrs. Seal became involved in MRS later around the time she

1    retired from Newmont Mining. *Id.* at 7-15. She has been trying to learn how to maintain the

2    books of records. *Id.* at 17-18. Since 2012, the Seals have maintained debtor's books and records

3    at their residences in Reno and Spring Creek, Nevada. *Id.* at 16-17. Debtor does not own any real

4    property, does not lease any real property, has not paid rent to the Seals and does not have

5    personal property other than its two Hydro-Jex trailers (Bk. Dkt. 1, Sch. A, ¶47). The trailers

6    were stored at the Seals' home in Spring Creek. **Exhibit 7**, 12/6/19 T. Seal Dec. at ¶6.

7           During the Arbitration, the Seals paid themselves at least $1.2 million in equity

8    distributions from MRS and more than $1 million in purported salary and bonuses. *See, e.g.,*

9    **Exhibit 8**, 2/4/20 T. Seal Dec. at ¶¶6-7 & Ex. 1 (distributions and salary). Dr. Seal testified that

10   ████████████████████████████████████████████████████████

11   ██████████. Ex. 6, Trans. at 88-93. His rationale: ████████████████████████

12   ████████████████████████████████████████████████████████

13   ██████████ Ex. 6, Trans. at 90-91

14          Judge Pro disagreed with Dr. Seal's assessment. He evaluated the competing testimony

15   from (1) Dr. and Mrs. Seal, (2) GLA's four witnesses; and (3) the parties' experts. Ex. 1, Final

16   Award at 6. He found GLA's witnesses "to be more credible" than the Seals. *Id.* at 7. He also

17   "reject[ed] MRS' argument that Dr. Seal had personally delivered a draft work order" to GLA.

18   *Id.* at 8. The credibility determination supported the $2-million award for GLA.

19          **c.   Dr. Seal also owns Differential and dominates its decision-making**

20          Differential also is owned by Dr. Seal. Ex. 6, Trans. at 68. The company's state filings

21   identify Dr. Seal at president and director, and Mrs. Seal as secretary and treasurer. **Exhibit 9**,

22   Nev. Sec. of State summary filings. All contact information for the business is the Seals' home in

23   Reno. *Id.* Dr. Seal testified that █████████████████████████████████

24   ██████████████████. Ex. 6, Trans. at 75. Since 2015, MRS has worked on two mining

**KAEMPFER CROWELL**
50 West Liberty Street, Suite 700
Reno, Nevada 89501

projects in Mexico and a joint venture in the Middle East. Each time, MRS has "brought in" Differential as a contractor. *Id.* at 68-74. In the mining project with GLA, MRS paid more than $100,000 to Differential for Dr. Seals' consulting work. *Id.* at 73-74.

MRS claims that it incurred two debts to Differential during the GLA-MRS Arbitration. Differential is scheduled with a secured claim for $958,707 incurred in January 2019, apparently under a contract for consulting fees and perfected under the Uniform Commercial Code (Bk. Dkt. 1, Sch. D). Differential also is scheduled for a second secured claim of $776,858 incurred on July 19, 2019 (after the Arbitration hearing had concluded), apparently for licensing Differential's patent and perfected under the Uniform Commercial Code. *Id.* However, GLA has only located one financing statement filed with the Nevada Secretary of State. **Exhibit 10**, Search results for MRS with Nevada Secretary of State; 8/24/19 Financing Statement.[2] MRS admits Differential is an insider. (Bk. Dkt. 1, Sch. D). The debt incurred on the patent license is within the period of an insider preference, as was the filing of the financing statement.

### 3.  GLA brought its second action to recover from the Seals and Differential

On March 3, 2020, Dr. Seal was subject to a judgment debtor's deposition in *GLA I*. Dr. Seal admitted that ███████████████████████. Ex. 6, Trans. at 76. According to Dr. Seal, ████████████████████████████████ ████████. *Id.* ████████████████████████████████████████████ ████████████████████████████████████. Dr. Seal claimed ████ ████████████████████████████████████████████. *Id.* at 79.

---

[2] Michael Brown, debtor's counsel, advises he has located two security agreements and one financing statement. He is still reviewing debtor's records and agreed to amend debtor's schedules as necessary after the creditor's meeting scheduled for August 6, 2020.

KAEMPFER CROWELL
50 West Liberty Street, Suite 700
Reno, Nevada 89501

GLA then sued MRS, the Seals and Differential in *GLA II*. MRS, the Seals and Differential are jointly represented by the Brownstein Hyatt law firm,[3] the same firm that represents MRS and Dr. Seal in *GLA I* and MRS's appeal.[4] The operative complaint alleges that the Seals and Differential are liable for (1) the *GLA I* judgment as alter egos of MRS; (2) actual and constructively fraudulent transfers contrary to NRS Chapter 112; and (3) illegal equity distributions authorized and received contrary to NRS Chapter 78 (*GLA II*, Dkt. 11). On June 9, 2020, the court entered its scheduling order and denied the defendant's motion to stay discovery on the alter ego claim. **Exhibit 11**, *GLA II*, Dkt. 34. A contested motion to dismiss by MRS is fully briefed and pending (*GLA II*, Dkt. 18, 20 & 28). GLA has not prosecuted the action since MRS filed for bankruptcy on June 6, 2020, as its claims may be property of the bankruptcy estate. *See CBS, Inc. v. Folks (In re Folks)*, 211 B.R. 378 (BAP 9th Cir. 2011).

### 4. GLA filed for bankruptcy, and the trustee sued GLA

On July 6, 2020, debtor filed its Chapter 7 petition. The schedules and statements appear to be substantively deficient due to at least one omission. During the post-judgment discovery three months before bankruptcy, Dr. Seal testified that ███████████████████████ ███████████████████████████████████████████ . Ex. 6, Trans. at 32-40. ███████████████████ ██████████████████████████████████████████████████████ . *Id.* ██████████████████ █████████████████████████████████████████████████████

---

[3] Woodburn & Wedge appeared in the bankruptcy for Differential. The firm was not engaged to represent Differential in litigation, according to Seth Adams.

[4] The Seals and Differential are not identified on MRS' schedules as co-debtors of the debt owed to Brownstein (Bk. Dkt. 1, Sch. G). Mr. Brown, debtor's counsel, advises that only MRS signed the engagement letter for *GLA I*, but that MRS, the Seals and Differential signed the engagement letter for *GLA II*. He is attempting to allocate the debt owed on the two matters and will amend the schedules.

KAEMPFER CROWELL
50 West Liberty Street, Suite 700
Reno, Nevada 89501

1   █████████ Ex. 8, T. Seal Dec. at ¶5. The █████████ is not scheduled as an asset by debtor, so

2   the current status is unknown.[5]

3        The U.S. Trustee appointed Christopher Burke as trustee. The trustee filed an adversary

4   complaint against GLA, alleging it obtained $169,000 in preference payments 89 days before

5   debtor filed for bankruptcy. *Burke v. Metal Recovery Solutions, Inc.*, No. 20-05025 (Bankr. D.

6   Nev.). The trustee has not completed service of the complaint and summons with its mailing

7   solely addressed to "Geo-Logic Associates, Inc." (Adv. Dkt. 6). Fed. R. Bankr. P. 7004(b)(3).

8   **II. LEGAL STANDARD**

9        A Chapter 7 case may be dismissed for "cause." 11 U.S.C. § 707(a). Cause is not defined,

10  but "bad faith" is not cause for dismissal in Chapter 7. *Neary v. Padilla (In re Padilla)*, 222 F.3d

11  1184, 1193 (9th Cir. 2000). A two-part test applies to determine if cause warrants dismissal:

12  
13  
14  
15            First: a court must consider whether the circumstances asserted to
    constitute "cause" are contemplated by any specific Code provision
    applicable to Chapter 7 petitions. If the asserted "cause" is
    contemplated by a specific Code provision, then it does not constitute
    "cause" under 707(a). If, however, the asserted "cause" is not
    contemplated by a specific Code provision, then the court must
    further consider whether the circumstances asserted otherwise meet
    the criteria for "cause" for discharge under § 707(a).

16

17  *Sherman v. SEC (In re Sherman)*, 491 F.3d 948, 970 (9th Cir. 2007).

18       If no specific Code section addresses the asserted cause, courts consider the "totality of the

19  circumstances." *Hickman v. Hana (In re Hickman)*, 384 B.R. 832, 840 (BAP 9th Cir. 2008). Two

20  district courts affirmed dismissal due to self dealing between debtor and its principal. *In re Humcor,*

21  *Inc.*, No. C09-1090, 2010 WL 1641531 (W.D. Wash. April 21, 2010); *U.S. Voting Machines, Inc. v.*

---

22  [5] GLA also has identified other substantive discrepancies regarding █████████ Ex. 6 at

23  41, its codebtors, and its secured claims, as noted elsewhere in this motion. The clerk of the court also
    noticed filing deficiencies with improper forms for the petition, statement of financial affairs, disclosure
    of compensation, and other filings, as well as a defective corporate resolution (Bk. Dkt. 5, July 7, 2020).

24  Debtor subsequently filed the resolution, although without a case caption (Bk. Dkt. 10, 12), and a
    disclosure of compensation, although seeking additional compensation for debtor's counsel (Dkt. 11). *See*
    *Lamie v. U.S. Trustee*, 540 U.S. 526 (2004).

KAEMPFER CROWELL
50 West Liberty Street, Suite 700
Reno, Nevada 89501

*Powelson (In re U.S. Voting Machines, Inc.)*, No. C 05-01281, 2007 WL 4287526 (N.D. Cal. Dec. 6, 2007).

In *Humcor*, debtor breached its lease, and the landlord sued on its statutory lien. The action would leave little for two junior secured creditors: (1) a hard-money lender whose members included debtor's controlling shareholder and his relatives, and who shared an address with debtor, and (2) a bank with a guarantee from debtor's controlling shareholder. A year later, the controlling shareholder put Humcor in to bankruptcy to try to subordinate the landlord's claim.

The bankruptcy court granted landlord's motion to dismiss, and the district court affirmed. Appellants argued that the rearrangement of liens was appropriate under Sections 507 (priority), 545 (liens), 551 (preservation of avoided transfers), and 726 (distributions). The district court disagreed, holding that those "sections all assume a bankruptcy free from misconduct." 2010 WL 1641531 at *5. The court held Section 362, with resumption of the landlord's litigation, would be ineffective because debtor sought to avoid the landlord's lien in bankruptcy. Debtor's bankruptcy gives "preferential treatment to creditors that are related to debtor. … The Bankruptcy Code does not countenance the type of behavior exhibited by [debtor's principal] and [debtor]. … The self-dealing on the part of [debtor's principal] constitutes 'cause' for dismissal." *Id.*

*U.S. Voting Machines* also was filed for the benefit of debtor's principal. The owner was personally involved in litigation, and he put debtor in bankruptcy to stop its payment to his litigation adversary. The bankruptcy court granted the adversary's motion to dismiss, and the district court affirmed. The bankruptcy court "purposefully looked at the totality of circumstances, noting that bad faith was not irrelevant to its analysis." 2007 WL 4287526 at *3. The bankruptcy court also "reasonably concluded that the case before it essentially was a two-party dispute as to whether [principal] or [adversary] had the right to receive the funds." *Id.* at *4. The continuation of the

1    bankruptcy case "would waste precious judicial resources because it would require it to involve

2    itself in a dispute already being fully litigated." *Id.*

3                                        **III. ARGUMENT**

4           This case serves no purpose under the Bankruptcy Code. It is a two-party dispute

5    between GLA and the Seals. The Seals engaged in self-dealing with their two companies, MRS

6    and Differential, to advantage them over GLA. This constitutes cause for dismissal.

7           GLA sued MRS in 2017, and the parties proceeded with Arbitration. Since then, the Seals

8    manipulated MRS to their advantage. Dr. Seal has twice testified ██████████████████

9    ████████████████████████████████████. Yet when Chief Judge Du

10   entered judgment for more than $2 million against MRS, ███████████████████

11   ███████████████████.

12          Discovery has exposed transactions to benefit the Seals. The Seals own both MRS and

13   Differential. The Seals admit that during the GLA-MRS dispute, they directed MRS to pay them

14   at least $1.2 million in equity distributions. The Seals also directed MRS to pay them during the

15   Arbitration more than $1 million in purported salary and bonuses. The Seals also directed MRS

16   to pay more than $100,000 to Differential, allegedly for Dr. Seal's consulting work done.

17          The Seals not only drained MRS of cash, but of its assets. ███████████████

18   ████████████████████████████████████████████████

19   ████████████████████████████████████████████

20   ████████████████████████████████████████████

21   ████████████████████████████████████████████████

22   ██████████████████████████████████████████████

23   ████████████████████████████████████████████████

24   ██████████████████

**KAEMPFER CROWELL**
50 West Liberty Street, Suite 700
Reno, Nevada 89501

1    The Seals also took additional steps to favor themselves in the event of a judgment.

2    During Arbitration, they provided Differential with security interests to secure $1.7 million in

3    payments allegedly owed by MRS. After the judgment, MRS still had several hundred thousands

4    of dollars in the bank and two trailers worth an estimated $1 million—but the Seals claim all of

5    that is secured by financing statements in favor of Differential.

6    The Seals are engaged in a shell game. ████████████████████

7    ████████████████████. Virtually all of that money is allegedly gone from MRS,

8    with ███████████████████████

9    ██████████. █████████████████

10   ████████████████████████.

11   And, even as the Arbitration was proceeding, the Seals helped themselves by granting security

12   interests in MRS's assets in favor of Differential and perfecting at least one of them days before

13   the Arbitration award was entered against MRS.

14   In deciding whether to dismiss the case, the Ninth Circuit held that the misconduct should

15   first be evaluated in the light of specific provisions of the Bankruptcy Code. The circuit

16   originally directed courts to consider the most appropriate provisions to deal with the

17   misconduct: nondischargeability for debtor's pre-petition fraud (§ 523); denial of discharge tied

18   to fraud in the filing (§ 727); substantial abuse of consumer debt (§ 707(b)); and cause

19   (§ 707(a)). *Neary v. Padilla (In re Padilla)*, 222 F.3d 1184, 1193 (9th Cir. 2000). The first three

20   provisions are limited to consumer cases. They do not apply in this corporate case, making

21   dismissal for cause under Section 707(a) as the proper procedural path.

22   The circuit also has considered whether the misconduct can be addressed by stay relief or

23   preference actions. *Sherman v. SEC (In re Sherman)*, 491 F.3d 948, 970 (9th Cir. 2007). Two

24

**KAEMPFER CROWELL**
50 West Liberty Street, Suite 700
Reno, Nevada 89501

district courts, though, have held that in two-party disputes, with cases filed for the benefit of the debtor's principals, alternative statutes are not a meaningful way to address the misconduct.

In *Humcor*, the principal hoped to use the bankruptcy to subordinate the claim of debtor's landlord, shifting payments to entities that benefitted debtor's principal. The district court affirmed the ruling that stay relief did not provide the landlord with a remedy. Although the landlord could return to state court to liquidate its claim, the harm still occurred in the bankruptcy with the reordering of claim priorities to benefit debtor's principal. The bankruptcy court held, and the district court affirmed, that cause existed for dismissal because of the self-dealing.

The district court affirmed a similar conclusion in *U.S. Voting Machines*. The bankruptcy was designed to benefit debtor's principal, preventing debtor from making a payment to principal's personal creditor. The bankruptcy court held that the principal's manipulation of the debtor was improper, and that the existing litigation was a better resolution than the bankruptcy.

The same is true with the GLA-MRS dispute. Stay relief does not provide any relief for GLA. It already liquidated its damages with a judgment against MRS, and it appears to be displaced from its collections efforts pled against the Seals and Differential in *GLA II*.

Furthermore, GLA already has developed evidence and begun prosecution of claims for fraudulent transfer and illegal equity distributions against the Seals and Differential. No other parties are meaningfully involved in this dispute. Debtor scheduled secured debts of $1.7 million owed to Differential (which, again, is wholly owned by the Seals). Debtor's litigation counsel is scheduled with a claim for $50,000, at least some of that is jointly owed by the Seals and Differential. Their remaining creditors make up 0.05 percent of MRS's scheduled debt. This is a two-party dispute between GLA and the Seals, and it should be resolved through GLA's pending litigation in U.S. District Court.

There is no reason to stop GLA's prosecution and substitute the trustee in its place. If the claims are proven, then GLA benefits; if the claims are denied, then GLA suffers. But by filing the case, the trustee is effectively an intervenor, depleting the estate assets that otherwise pay GLA. The trustee has filed an adversary against GLA for preferences made just before the close of the look-back period. The trustee seeks to use that money to fund the trustee's prosecution of the action. Instead, that money should go to GLA to pay down its judgment. There is no reason to disgorge funds from GLA, just so the trustee can seek to recover more funds for GLA. There is no point in substituting the trustee's judgment, knowledge, and discretion for GLA's. The Seals have manipulated matters in their favor, and the bankruptcy should be dismissed in favor of GLA's own litigation.

## IV. CONCLUSION

This is a two-party dispute that began in 2015 with a contract between GLA and MRS. In 2016, MRS breached the contract. The dispute moved to litigation in 2017, and Arbitration in 2018. In 2019, the arbitrator entered an award for more than $2 million owed by MRS to GLA. In 2020, the district court confirmed the award. GLA already has pursued post-judgment discovery and collection efforts. GLA also is prosecuting a second lawsuit seeking to recover from the Seals and Differential, as alter egos liable for the judgment, and recipients of more than $2.2 million in fraudulent transfers and illegal equity distributions.

This bankruptcy simply benefits the debtor's owners and their other company. They have engaged in self dealing to protect their assets and avoiding paying GLA. The totality of the circumstances constitutes cause, and GLA request this Court dismiss this case under Section 707(a).

Dated this 4th day of August, 2020                KAEMPFER CROWELL

By /s/ Louis M. Bubala III
    Louis M. Bubala III

Attorneys for Creditor
Geo-Logic Associates, Inc.

KAEMPFER CROWELL
50 West Liberty Street, Suite 700
Reno, Nevada 89501

**Index of Exhibits**

| Exhibit No. | Description | No. of Pages |
|---|---|---|
| 1 | Final Award, Arbitration (Arbitration 9/21/2019) | 10 |
| 2 | Order confirming Final Award (*GLA I* Dkt. 57 1/6/2020) | 8 |
| 3 | Judgment (*GLA I* Dkt. 58 1/6/2020) | 1 |
| 4 | Writ of Execution/Garnishment (*GLA I* Dkt. 101 4/3/2020) | 2 |
| 5 | Declaration of Thom Seal (Arbitration 5/31/2018) *Filed under seal because submitted in non-public filing with JAMS | 5 |
| 6 | Post-Judgment Transcript, Dr. Seal (*GLA I* 3/3/2020) *Filed under seal with this motion because designated confidential for attorneys eyes only | 101 |
| 7 | Declaration of Thom Seal (*GLA I* Dkt. 49 12/6/2019) | 5 |
| 8 | Declaration of Thom Seal (*GLA I* Dkt. 59 2/4/2020) *Filed under seal with this motion because filed under seal in U.S. District Court | 10 |
| 9 | Nevada Secretary of State Summary for Differential | 2 |
| 10 | UCC search results and MRS UCC-1 Financing Statement | 2 |
| 11 | Order Denying Stay (*GLA I* Dkt. 34 6/9/2020) | 8 |
| 12 | Excerpt of Thom Seal Testimony (Arbitration 5/29/2019) *Filed under seal because submitted in non-public filing with JAMS | 9 |

# Exhibit 1

# Exhibit 1

Hon. Philip M. Pro (Ret.)
JAMS
3800 Howard Hughes Parkway
11th Floor
Las Vegas, NV 89169
Phone: (702) 457-5267
Fax:    (702) 437-5267
Arbitrator

## JAMS ARBITRATION CASE REFERENCE NO. 1260004635

GEO-LOGIC ASSOCIATES, INC.,

    Claimant & Counter-Respondent,

    vs.

METAL RECOVERY SOLUTIONS INC.,

    Respondent & Counter-Claimant.

**FINAL AWARD**
**CORRECTED SEPTEMBER 21, 2019**

On September 13, 2017, Geo-Logic Associates ("GLA") commenced this action against Metal Recovery Solutions, Inc. ("MRS") and its founder and President, Dr. Thomas Seal, in the United States District Court for the District of Nevada. GLA's Complaint set forth claims for Breach of Contract, Misappropriation of Trade Secrets, Unjust Enrichment, Quantum Meruit, and Accounting.

On October 26, 2017, GLA and MRS stipulated to stay the action in United States District Court to pursue Binding Arbitration in accord with the Master Services Agreement ("MSA") entered by the Parties on October 21, 2015. On November 8, 2017, Claimant GLA initiated this Arbitration before JAMS by filing a Demand for Arbitration and Complaint naming only MRS as Respondent. On December 6, 2017, MRS filed an Answer and Counterclaim.

On April 3, 2018, MRS was granted leave to file an Amended Counterclaim alleging claims for Trade Secret Misappropriation under NRS Sec. 600A, *et seq.*, Trademark Infringement, Breach of Contract, and Breach of the Covenant of Good Faith and Fair Dealing, and Motion for Temporary Restraining Order. Following briefing and oral argument MRS' Motion for Temporary Restraining Order was denied on August 13, 2018.

1

Additionally, on April 3, 2018, the undersigned found that this tribunal has jurisdiction to arbitrate the dispute pursuant to Paragraph 27 of the MSA and has previously ruled that the substantive law of the State of Nevada governs this action in accord with MSA paragraph 26.

Following extensive, and at times contentious discovery, an Order was entered on April 8, 2019 granting GLA's Motion for Summary Judgment on MRS' Counterclaims for Trademark Misappropriation, Trademark Infringement, and for Breach of the Non-Circumvention and Non-Disclosure Agreement.

The Arbitration Hearing was conducted from May 28-31, 2019 at the offices of Litigation Services in Reno, Nevada. GLA appeared through its corporate representative, Gary Lass, and was represented by Ronald P. Oines, Esq., Edson K. McClellan, Esq., and Kenneth Zielinski, Esq. of Rutan & Tucker, LLP. MRS appeared through its founder and President, Dr. Thomas Seal, and was represented by Michael D. Rounds, Esq., and Adam K. Yowell, Esq., of Brownstein Hyatt Farber Schreck, LLP. Following preparation of the hearing transcript, post-hearing briefing was completed on July 30, 2019.

## DISCUSSION

The Parties to this arbitration are two companies which provide engineering and technical services in connection with the mining of precious metals. Testimony of several witnesses at the arbitral hearing explained the contractual relationships established between GLA and MRS under the MSA and the respective services provided by each.

Dr. Thomas Seal testified at length to the operations of MRS and the mining technology underlying this dispute. Seal holds a Ph.D. in Mining Engineering, with an emphasis on Metallurgy, and has nearly 40 years of experience in the mining industry. From 1995 to 2008, Seal was employed by the Newmont Mining Company where he refined a process for heap leach mining to extract precious minerals, such as gold or silver, from low grade mining ore.[1]

Refinements to the process developed by Seal as part of his Ph.D. studies involved a system requiring both geophysical surveying to determine the best location for mining wells, and high-pressure injection (hydraulic fracturing or "fracking") of the ore at the well location prior to chemically treating the ore to dissolve precious metals. Newmont eventually secured U.S. Patent No. 8,021,461 for the "Hydro-Jex" heap leaching process invented by Dr. Seal and described in

---

[1] Heap leaching is a process by which low grade ore is crushed and placed in a heap atop an impermeable liner. Reagents and liquid media are introduced into the ore through a drip or similar low-pressure system to chemically dissolve the precious metals which can be transported from the liner to a pond where it can be recovered.

his doctoral dissertation.[2] While at Newmont, Seal also designed and built a trailer mounted hydraulic device, called "1G1" to implement the Hydro-Jex technology, and began development of a second version of the equipment called "2G1."

Seal testified that he retired from Newmont in 2008, and in 2009 founded MRS serving as its President, CEO, and CTO. His spouse, Jett Seal, serves as Secretary and Treasurer of MRS and performs general bookkeeping functions for the company.

Seal testified that after MRS was retained to perform mining work using Hydro-Jex technology at Cripple Creek Gold Mine in Colorado, he began to think of ways to redesign the equipment used in the process to increase productivity. This resulted in development of the "3G1" Hydro-Jex system for which Seal obtained U.S. Patent No. 9,050,545 owned by Differential Engineering, another of Seal's companies, and licensed to MRS. Seal testified that the 3G1 system was employed for mining operations at both Cripple Creek and later at the Los Filos mine in Guerrero State, Mexico which is central to this case.

In early 2015, Jeet Basi of Goldcorp Inc., a gold production company headquartered in Vancouver, British Columbia, Canada, contacted Seal regarding engaging MRS to use its Hydro-Jex system at Goldcorp's Los Filos heap leach gold mine project in central Mexico. Seal testified that after signing a Non-Disclosure Agreement ("NDA"), he and Basi visited the Los Filos mine site, and on June 3, 2015 signed a Services Agreement for use of MRS' Hydro-Jex system at Los Filos.

Seal testified that MRS did not have sufficient staff to fully implement and discharge its obligations under the Services Agreement with Goldcorp and decided to retain the services of GLA. GLA is a geologic, geotechnical, civil, and environmental firm with more than 250 geologists, engineers, and staff located at 25 offices across eight States and an affiliate office in Lima, Peru.

Stephen Morrow, principal engineer for GLA, testified that in July 2015, MRS approached GLA to provide personnel to work on the Los Filos project to operate the Hydro-Jex pump rig and to manage the project, as MRS lacked the resources to supply these services itself. On October 21, 2015, GLA and MRS entered into the MSA pursuant to which GLA was to provide contracting services for the benefit of MRS in accordance with specifications set out in work orders to be entered as needed for work to be carried out in designated Phases. GLA's contract related claims stem from events which unfolded at the Los Filos mine site thereafter.

---

[2] Seal, T., <u>Enhanced Gold Extraction in Cyanide Heap Leaching Using Hydro-Jex Technology</u>, Ph.D. Dissertation, U. of Idaho, May 2004.

The following findings and conclusions are based upon a preponderance of the evidence adduced at the Arbitration hearing.

I.      GLA's CLAIM RELATING TO PHASE 2a.

On November 11, 2015, GLA and MRS entered into "Work Order Number: 1 [etc.]" for "Phase I". GLA performed services at Los Filos for Phase I of the project and was timely paid in full by MRS on a time-and-materials basis with payment at specified hourly rates plus travel, meals, and lodging.

Phase 2 was divided into three sub-Phases, 2a, 2b, and 2c. Phase 2b proceeded first, followed by 2c, and finally 2a. On May 13, 2016, GLA and MRS entered into "Work Order Number: 2-B" for Phase 2b at Los Filos. Phase 2, however, involved a different payment scheme from that employed in Phase 1. For Phase 2, MRS would pay GLA agreed upon and distinct hourly rates for project managers and support staff, GLA's travel, meal, and lodging expenses, and for personal protection equipment plus 30% of the gross profit from Phase 2b. GLA completed the work on Phase 2b and submitted an invoice to MRS on August 30, 2016 which MRS paid including the 30% share of its gross profits.

Morrow testified that GLA next completed the work on Phase 2c and submitted an invoice to MRS on September 19, 2016. Again, MRS paid the invoice including the 30% of its gross profits. As with the invoice for Phase 2b, the invoice for Phase 2c was accompanied for receipts and other back-up documentation for expenses. Significantly, MRS did not request additional documentation to support other labor or expenses reflected on the invoices.

After GLA completed its work at Los Filos for Phase 2a it submitted an invoice for $31,116.04 to MRS on November 18, 2016. The invoice included the same type of back-up documentation GLA had included with its invoices for Phases 2b and 2c. MRS, however, refused to pay GLA's Phase 2a invoice and the 30% profit share due even though Goldcorp had fully paid MRS for the work completed on Phase 2a.

In this action, GLA claims it is entitled to recover contract damages from MRS in the sum of $106,321 plus pre-judgment interest commencing on December 18, 2016 for services performed under the MRS Work Order for Phase 2a. A preponderance of the evidence adduced supports GLA's claim.

MRS responds variously that its failure to pay GLA was warranted due to issues with respect to GLA's cost invoicing for Phase 2a; because Seal had an issue with GLA's maintenance of the Hydro-Jex pump; that MRS did not have an opportunity to audit documentary evidence supporting the Phase 2a invoice; and that the monies invoiced for employee salaries and insurance

4

does not square up with the employee salaries and insurance costs actually paid. I find the arguments made by MRS to be unavailing.

Although evidence was presented that the Hydro-Jex pump broke down and needed repeated maintenance throughout its use at Los Filos for Phase 2, no evidence was adduced showing that GLA was responsible for the pump's failure. Moreover, the record shows that MRS anticipated the pump would need additional maintenance prior to commencement of operations for Phase 3, and that it was the failure of MRS to act in a timely and workmanlike manner that contributed to the failure of the pump and its unavailability for use as intended for Phase 3.

Additionally, GLA correctly argues that the written work order for Phase 2b applied to all Phase 2 phases including 2a, and clearly provided for specified rates of $195 per day for project managers and $144 per day for support staff. This is the amount billed in the invoice for Phase 2a for undisputed hours worked, and GLA provided back up documentation for all other fees and expenses actually incurred. Whether MRS later understood that GLA was paying less to employees or for insurance does not alter the content of the agreement and does not excuse MRS' failure to adhere to the agreed upon payment arrangement.

MRS agreed to the terms of payment for the work performed on Phase 2a, just as it did with respect to work performed by GLA on Phases 2b and 2c. MRS has offered no viable defense to GLA's claim for breach of contract on Phase 2a and GLA is entitled to recover the sum of $106,321 plus pre-judgment interest commencing December 18, 2016.

II.    GLA'S CLAIM RELATING TO PHASE 3.

While GLA performed its work on Phase 2 at Los Filos, GLA and MRS continued their negotiations regarding GLA's participation in Phase 3. These negotiations included discussions of a possible Joint Venture agreement between MRS and GLA which were never consummated.

GLA contends that at a meeting conducted on September 23, 2016, GLA insisted upon, and MRS orally agreed to continue the 70/30 profit split as set forth in the Phase 2b Work Order for Phase 3. GLA asserts that MRS encouraged GLA to secure the work from Goldcorp for Phase 3, but that it was not until GLA had done so that MRS informed GLA that it no longer intended to proceed with the 70/30 profit split with GLA for the Phase 3.

GLA contends that the conduct of MRS constituted a breach of their agreement that caused GLA damage in the amount of $1,890,646 which represents 30% of $6,302,154 profit MRS received from Goldcorp for Phase 3. Additionally, GLA maintains it is entitled to $40,709 for employee time and unreimbursed expenses related to GLA's work on Phase 3.

5

GLA further contends that even if its breach of contract theory is rejected, it is entitled to recover damages on an equitable theory of Unjust Enrichment/Quantum Meruit because the value conferred on MRS as a result of the work GLA performed in securing the Phase 3 agreement with Goldcorp was worth at least 30% of the profits derived. *Panix Promotions, Ltd. V. Don King Productions, Inc.,* 238 P.3d 844 (Nev. 2008); and *Asphalt Products Corp. v. All Star Ready Mix, Inc.,* 898 P.2d 699, 701 (Nev. 1995).

MRS responds that the Parties originally anticipated that Phase 3 would commence in October 2016. However, the Phase 3 Work Order between Goldcorp and MRS was not signed until November 16, 2016, and work on Phase 3 was not scheduled to commence until December 5, 2016. MRS acknowledges that during the summer of 2016 there were many discussions and exchanges of draft agreements concerning a possible Joint Venture with GLA for Phase 3 which included a split of profits but maintains that no oral or written agreement with GLA regarding Phase 3 was ever reached. Therefore, MRS contends there is no basis in law or equity to award GLA any share of MRS' profits from work on Phase 3, particularly because GLA was no longer performing work at Los Filos when work on Phase 3 actually commenced.

The flaw in MRS' argument is that it fails to account for the work performed by GLA in securing the Phase 3 Work Order between MRS and Goldcorp. A preponderance of the evidence clearly shows that GLA was principally responsible for negotiating and securing the agreement between MRS and Goldcorp for Phase 3. That does not fully resolve the issue, however.

MRS and GLA had no written agreement with respect to compensation for services to be provided by GLA with respect to Phase 3. Therefore, resolution of the dispute concerning the scope of the oral agreement, if any, reached at the September 23, 2016 meeting at GLA's offices in Sparks, Nevada, is critical.

According to the evidence adduced, the September 23rd meeting lasted approximately 3 ½ hours and was attended by Gary Lass, Stephen Morrow, Robert Valceschini, and Dolliver Frederick on behalf of GLA, and Thomas Seal, Mark Shonnard, and Jette Seal on behalf of MRS. Frederick is now deceased and Shonnard, who left in the middle of the meeting, did not testify at the arbitral hearing. However, Gary Lass, Stephen Morrow, Robert Valceschini, Thomas Seal, and Jette Seal did.

The September 23rd meeting is pivotal to the outcome of this dispute and is framed by the fact that the relationship between GLA and MRS at Los Filos since the inception of their contractual relationship for Phases 1 and 2 was built on a profit split of 70/30. Those at the meeting have different recollections of what occurred which are consistent with their positions as Claimant and Respondent in this litigation. This may not be surprising, but as the versions are irreconcilable it does require a finding as to which version of events is most accurate.

From the testimony adduced, it is clear that while other subjects were addressed, including the possibility of a future joint venture between MRS and GLA, the principal topic of the meeting was to discuss the profit split for Phase 3 at Los Filos. After an initial objection by Thomas Seal that a 70/30 profit split for Phase 3 was excessive, and according to Thomas and Jette Seal a counter proposal of an 80/20 split, Gary Lass testified that he graphically illustrated on a white board why a profit split of 70/30 split was fair and that GLA could not go forward for less.

Although Thomas and Jette Seal testified that they recall the discussions at the September 23rd meeting differently with regard to the agreement of MRS to go forward with the 70/30 profit split for Phase 3, I find the testimony of Lass, Morrow and Valceschini that Thomas Seal did so on behalf of MRS to be more credible.

Specifically, I find that Thomas Seal verbally expressed his agreement to the fundamental material term of a 70/30 split for Phase 3 consistent with the payment arrangement the Parties had utilized for Phase 2. This conclusion is also consistent with the handwritten notes of the late Dolliver Frederick taken at the September 23rd meeting.

Further, I find that MRS' agreement to the 70/30 profit split was the decisive factor that induced GLA to continue its successful negotiations with Goldcorp to secure the Work Order Agreement for Phase 3 on behalf of MRS. In sum, I find that as of September 23, 2016, MRS and GLA had mutually agreed to the material terms of their contract for Phase 3 at Los Filos contingent upon MRS securing its agreement with Goldcorp. *May v. Anderson,* 119 P.3d 1254, 1257 (Nev. 2005), and *Certified Fire Prot. Inc. v. Precision Constr.,* 283 P.3d 250, 255 (Nev. 2012). See also Restatement (Second) of Contracts (1981), Sec. 33(2).

Following the September 23rd meeting, GLA's Steven Morrow and Victoria Rodriguez, who managed GLA's operations in Lima, Peru, continued extensive negotiations on behalf of MRS with Goldcorp in Mexico to secure the Phase 3 contract between MRS and Goldcorp. These negotiations occurred throughout October and early November 2016, culminating on November 15, 2016 when Goldcorp sent MRS a signed work order proposal for Phase 3 at Los Filos.

On November 16th, Stephen Morrow sent Thomas Seal and Mark Shonnard a revised Work Order for Phase 3A which provided for a 70/30 profit split which was consistent with the Phase 2 payment arrangement between GLA and MRS. It was not signed by Seal, but the following day, Morrow and Rodriguez, on behalf of GLA, exchanged a string of emails with Seal and Shonnard concerning details of the work to be performed to get Phase 3 underway. At no point in this exchange did Seal or Shonnard express any objection to the 70/30 profit split.

The evidence shows that it was not until November 22, 2016, after the agreement with

7

Goldcorp for Phase 3 was secured, that Seal denied that MRS had agreed to a 70/30, and for the first time declared that the profit split with GLA would be 80/20.

I find MRS' refusal to proceed with Phase 3 under the 70/30 profit split terms agreed to at the September 23, 2016 meeting constituted a material breach by MRS of its oral contract with GLA. In doing so, I reject MRS' argument that Dr. Seal had personally delivered a draft work order reflecting an 80/20 profit split to GLA's offices in Sparks, Nevada on November 15, 2016.

Moreover, I reject MRS' argument that GLA's refusal to proceed with work on Phase 3 under an 80/20 profit split payment arrangement constitutes bad faith by GLA and disqualifies it from equitable consideration for its unjust enrichment claim.

The remaining question with respect to Phase 3 is the measure of damages to which GLA is entitled as a result of MRS' breach. GLA contends that in addition to unreimbursed expenses of $11,496, and unpaid employee time of $29,213, it is entitled to recover $1,890,646 which represents 30% of the gross profits MRS made on Los Filos Phase 3a and 3b of $6,302,154.[3] Consistent with its position that no agreement was reached for GLA's participation in Phase 3, MRS responds that GLA is not entitled to recovery of any damages.

"The general rule in a breach of contract case is that the injured party may be awarded expectancy damages, which are determined by the method set forth in the Restatement (Second) of Contracts Section 347 (Am. Law Inst. (1981))." *Century Surety Company v. Andrew,* 432 P.3d 180, 183 (Nev. 2018). Section 347 of the Restatement provides that the injured party is entitled to his expectation interest as measured by the loss of value caused by the breaching party, plus any other incidental or consequential loss, reduced by the cost or other loss avoided by not having to perform. *Id.*

Applying the Restatement standard to the evidence adduced, I find that GLA is entitled to recover from MRS the total sum of $1,931,355 as compensation for GLA's loss of unreimbursed expenses, unpaid employee time, and 30% of the profits derived by MRS from Phase 3 at Los Filos.

Alternatively, even if consequential damages for breach of contract were not available, the equitable doctrine of *quantum meruit* would compel the same result. *Panix, supra,* at *4. See also *Las Vegas Sands Corp. v. Suen,* No. 64594, 2016 WL 4076421, at *3 (Nev. July 22, 2016) (quoting *Certified Fire Prot. Inc. v. Precision Constr.,* 283 P.3d 250, 257 (2012), and *Risinger v. SOC LLC,* 936 F.Supp.2d 1235, 1246-47 (D. Nev. 2013).

---

[3] The fact that MRS unilaterally recharacterized Phase 3b of the Phase 3 Work Order as Phase 4 does not alter the calculation of the profits damage analysis.

8

III.    MRS COUNTERCLAIMS.

On April 8, 2019 GLA was granted Summary Judgment on MRS' Counterclaims alleging Trade Secret Misappropriation, Trademark Infringement, and Breach of GLA's Non-Disclosure and Non-Circumvention Agreement with MRS related to GLA's alleged use of MRS' "Hydro-Jex" technology to optimize GLA's heap leach processing at the Denton-Rawhide Mine ("Rawhide") in Fallon, Nevada.

The remaining counterclaims set forth in MRS' First Amended Counterclaim filed April 18, 2018 allege Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing in connection with the Services Agreement entered between GLA and MRS on October 21, 2015. The alleged breaches committed by GLA are set forth at paragraphs 139 through 160 of MRS' First Amended Counterclaim. Collectively, these allegations assert that GLA circumvented the Services Agreement by using MRS technology and processes to directly compete with MRS for heap leach processing work at Rawhide.

I find that the April 8, 2019 Summary Judgment Order foreclosed this claim. The Order on Summary Judgment clearly held there was no evidence that GLA used any of the numerous items claimed by MRS, including the MRS trailer design and equipment, "operational procedures," or chemistry and reagents revealed by MRS, at Rawhide. Nothing presented at the Arbitration hearing alters this finding.

Moreover, although testimony was presented regarding discussions between GLA and MRS concerning a potential joint working relationship for mining at Rawhide and elsewhere, the evidence adduced does not support a finding that GLA had any contractual obligation to share with MRS any profits derived by GLA from its work at Rawhide.

Indeed, the evidence established that the relationship between GLA and MRS ended well before GLA commenced work at Rawhide in August 2017, and there is no evidence that MRS played any role in assisting GLA secure work at Rawhide.

Finally, as asserted in GLA's responding Post-Hearing Brief filed July 30, 2019, MRS failed to present sufficient evidence to support its claim for damages.

For the foregoing reasons, GLA is entitled to judgment on the Counterclaims of MRS for Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing.

9

IV.    GLA'S ENTITLEMENT TO FEES ON MRS' TRADE SECRET AND
TRADEMARK INFRINGEMENT CLAIMS.

GLA argues it is entitled to recover its attorneys' fees incurred on MRS' claims for
Misappropriation of Trade Secrets and Trademark Infringement because MRS' claim was made
in bad faith.

In support of its request, GLA cites to MRS' conduct in litigating its motion for
preliminary injunctive relief, which was denied on August 13, 2018, and MRS' contradictory
conduct in opposing GLA's motion for Summary Judgment which was granted on April 8, 2019.
MRS responds that mistakes of MRS' prior counsel and losing the summary judgment motion are
insufficient to show bad faith warranting the severe sanction sought by GLA. I agree.

When MRS was represented by prior counsel, these proceedings were at times contentious
and marked by occasional delays caused by late filings. Additionally, some of the positions
advocated by MRS during pretrial proceedings were found to be without merit. I do not find,
however, these circumstances constitute a sufficient factual basis to warrant a finding of bad faith,
nor do they justify the imposition of a sanction awarding attorneys' fees in favor of GLA with
respect to denial of MRS' Motion for Injunctive Relief or the grant of Summary Judgment on its
Counterclaims. This is a contract action. Absent contractual provisions to the contrary, each Party
shall bear its own attorney's fees.

## CONCLUSION AND AWARD

Based upon the foregoing, the undersigned Arbitrator finds that Claimant, Geo-Logic
Associates, Inc., is entitled to an Award of judgment on it's claims against Respondent, Metal
Recovery Solutions, Inc., in the total amount of $2,037,586, plus prejudgment interest at the lawful
rate accruing from the commencement of this action in United States District Court on September
13, 2017.[4] Additionally, Geo-Logic Associates, Inc., is entitled to an Award of judgment against
Metal Recovery Solutions, Inc., on its Counterclaims.

IT IS SO ORDERED.

Dated: September 21, 2019

Hon. Philip M. Pro (Ret.)
Arbitrator

---

[4] The original Award entered August 31, 2019 was corrected this date pursuant to JAMA Rule 24(J).

# Exhibit 2

# Exhibit 2

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

GEO-LOGIC ASSOCIATES, INC.,

                       Plaintiff,

    v.

METAL RECOVERY SOLUTIONS, INC.,
*et al.*,

                    Defendants.

Case No. 3:17-cv-00563-MMD-WGC

ORDER

## I.  SUMMARY

This action stems from the parties' dispute relating to contracts for engineering and technical services in connection with the mining of precious metals. The Court stayed this action to allow the parties to arbitrate their dispute, which resulted in an award that Defendant now challenges. There are two substantive motions pending before the Court. First, Plaintiff Geo-Logic Associates, Inc. ("GLA") moves to (1) confirm the arbitration award, asking the Court to enter judgment regarding the same, and (2) seeks attorneys' fees and expenses ("GLA Motion").[1] (ECF. No. 25.) Second, Defendant Metal Recovery Solutions, Inc. ("MRS") moves to partially vacate the final arbitration award before the Court rules on the GLA Motion ("Motion to Vacate"). (ECF. No. 30.)[2] For the reasons discussed below, the Court confirms the arbitration award and accordingly denies the Motion to Vacate. GLA's request for attorneys' fees is denied.

---

[1]The Court notes that GLA's "motions" were not properly filed as required by LR IC 2–2(b) because each contains a different request for relief. Nevertheless, the Court will address each request.

[2]MRS has separately moved to seal certain exhibits to the Motion to Vacate. (ECF No. 29.) This Court has previously sealed similar exhibits for both parties in this case, (ECF No. 55; ECF No. 56), and finds that the same reasoning applies to MRS's motion. Therefore, MRS's motion to seal is granted.

## II.  BACKGROUND

GLA is a geologic, geotechnical, civil and environmental firm with 25 offices in eight states and an affiliate office in Peru. (ECF No. 1 at 2.) MRS is metallurgical engineering firm based in Reno, Nevada. (ECF No. 32 at 5.) Dr. Thomas Seal is the CEO, CTO and majority owner of MRS. (*Id.*) Goldcorp Inc. ("Goldcorp") is a gold production company with headquarters in Vancouver, British Columbia, Canada. (ECF No. 25-1 at 6.)

In June 2015, MRS entered an agreement with Goldcorp to provide services and equipment at Goldcorp's Los Filos gold mine ("Mine") project in central Mexico. (*Id.*) In October 2015, MRS retained the services of GLA to provide personnel and manage the project. (*Id.*) Per a Master Services Agreement ("MSA") between the parties, the work would be carried out in designated phases. (ECF No. 25–1 at 6.) At a meeting on September 23, 2016 ("Meeting"), MRS and GLA discussed a 70/30 profit split between MRS and GLA for Phase 3 of the project. (ECF No. 32 at 15.) In December 2016, MRS began work on Phase 3 without GLA's services. (ECF No. 1 at 8; ECF No. 39-1 at 44–45.)[3]

On September 23, 2017, GLA filed this action, asserting claims against MRS and Dr. Seal. (ECF No. 1.) In lieu of proceeding in this Court, the parties stipulated to binding arbitration as to claims against MRS. (ECF No. 20.) During arbitration, MRS asserted counterclaims against GLA. (ECF No. 25-1 at 4.) The arbitrator ultimately found in GLA's favor, awarding GLA $2,037,586, plus prejudgment interest at the lawful rate accruing from September 13, 2017—the date of commencement of this action.[4] (ECF No. 25-1 at 4–13.)

GLA's Motion seeks confirmation of the arbitration award and an executable judgment against MRS. MRS argues in response that the arbitrator improperly decided

---

[3]Additional factual background can be found in the arbitration award. (ECF No. 25-1 at 5.)

[4]GLA states that as of the date the GLA Motion was filed—September 25, 2019—prejudgment interest is $288,164.90. (ECF No. 25 at 5.) MRS does not dispute GLA's prejudgment interest calculation methodology. (ECF No. 34 at 2.)

certain terms of the award and has separately moved to vacate those terms.

## III.   LEGAL STANDARD

Review of an arbitration award is "both limited and highly deferential". *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1288 (9th Cir. 2009). Upon application for confirmation of an arbitration award, "the court must grant such an order unless the award is vacated, modified, or corrected . . .." 9 U.S.C. § 9. "The Federal Arbitration Act enumerates limited grounds on which a federal court may vacate, modify, or correct an arbitral award. Neither erroneous legal conclusions nor unsubstantiated factual findings justify federal court review of an arbitral award." *Kyocera Corp. v. Prudential–Bache Trade Serv. Inc.*, 341 F.3d 987, 994 (9th Cir. 2003) (internal citations omitted). Vacatur is permitted "where the arbitrator[] exceeded [his] powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). An arbitrator exceeds his powers "not when [he] merely interpret[s] or appl[ies] the governing law incorrectly, but when the award is completely irrational, or exhibits a manifest disregard of law." *Kyocera*, 341 F.3d at 997 (internal citations omitted). However, "if, on its face, the award represents a plausible interpretation of the contract, judicial inquiry ceases and the award must be enforced." *McKesson Corp. v. Local 150 IBT*, 969 F.2d 831, 833 (9th Cir. 1992).

"The completely irrational standard is extremely narrow and is satisfied only where the arbitration decision fails to draw its essence from the agreement." *Comedy Club,* 553 F.3d at 1288 (quoting *Hoffman v. Cargill Inc.*, 236 F.3d 458, 461–62 (8th Cir. 2001)). To determine if an arbitration award draws its essence from the agreement, courts view the agreement in light of its "language and context, as well as other indications of the parties' intentions." *Bosack v. Soward*, 586 F.3d 1096, 1106 (9th Cir. 2009) (quoting *McGrann v. First Albany Corp.*, 424 F.3d 743, 749 (8th Cir. 2005)). Additionally, if there is a basis in the record for the arbitrator's decision, it will not be deemed completely irrational. *See Comedy Club*, 553 F.3d at 1289.

Manifest disregard of the law requires more than an error in interpretation or

3

1   application of the law. *Thompson v. Tega–Rand Int'l*, 740 F.2d 762, 763 (9th Cir. 1984)

2   (per curiam). "[M]ere allegations of error are insufficient." *Collins v. D.R. Horton, Inc.*, 505

3   F.3d 874, 879 (9th Cir. 2007) (quoting *Carter v. Health Net of California*, Inc., 374 F.3d

4   830, 838 (9th Cir. 2004)). Instead, it must be "clear from the record that the arbitrator[]

5   recognized the applicable law and then ignored it." *Mich. Mut. Ins. Co. v. Unigard Sec. Ins.*

6   *Co.*, 44 F.3d 826, 832 (9th Cir. 1995).

7   **IV.    DISCUSSION**

8       MRS asserts that the portion of the award finding that MRS and GLA entered into

9   an oral contract for Phase 3 of the Mine is irrational and manifestly disregards the law.

10   (ECF No. 30 at 2–3.) As to the former, MRS claims the arbitrator disregarded a

11   requirement in the MSA that work orders for the Mine had to be in writing. (ECF. No. 30 at

12   2.) As to the latter, MRS argues that the arbitrator ignored the requirement that there must

13   be a meeting of the minds on all material terms in order for a contract to be formed. (ECF.

14   No. 30 at 2–3.) The Court will address each contention in turn.

15       On the issue of irrationality, MRS specifically claims that the arbitrator disregarded

16   a requirement in paragraph 1 of the MSA that work orders had to be in writing. (ECF No.

17   30 at 8.) To support its argument, MRS notes that the award "does not consider or

18   reference the requirement" that work orders had to be in writing, and that the arbitrator

19   failed to "reference or consider" a "plethora of material evidence proffered by MRS on this

20   central issue . . .." (ECF. No. 30 at 5–6.) MRS contends that the award is therefore

21   completely irrational. The Court disagrees.

22       It is a universally accepted rule that arbitrators are not required to state the reasons

23   for their decisions. *A.G. Edwards & Sons, Inc. v. McCollough*, 967 F.2d 1401, 1403 (9th

24   Cir. 1992) (citing *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593,

25   598 (1960)). This rule "presumes the arbitrator[] took a permissible route to the award

26   where one exists." *Id.* at 1403.

27       Here, there is enough evidence in the record for the arbitrator to plausibly find that

28   oral agreements were permissible under the MSA. As an initial matter, while the MSA

4

1    provides that work will be "set out in work orders", it does not state that such work orders

2    need to be in writing. (*See generally* ECF No. 30-2 at 101–113.) Notably, the MSA does

3    explicitly provide that other agreements have to be in writing. For example, paragraph 1

4    of the MSA states that "[n]o change in the amount due or time of performance shall be

5    effective until approved in writing by MRS . . .." (*Id.*) Additionally, paragraph 4 of the MSA

6    states that "[u]nless MRS agrees to otherwise in writing, the Contractor shall provide the

7    Services only through the 'Key Individual' or 'Key Individuals' listed in a Work Order." (*Id.*

8    at 102.) Because the MSA specifically identifies when certain agreements must be written,

9    the arbitrator could plausibly conclude that the lack of such identification for work orders

10   meant that they were not required to be in writing.

11        Similarly, the arbitrator could have concluded that the parties had a course of

12   conduct for orally agreeing to work orders. Relevantly, Phase 2B had a written work order,

13   but the parties orally agreed to apply this work order to Phases 2C and 2A. (ECF No. 30-

14   2 at 48–49.) In light of the parties' past oral agreements, the arbitrator reasonably could

15   have concluded that the Phase 3 work order was not required to be in writing. *See Metzler

16   Contracting Co. LLC v. Stephens*, 479 F. App'x 783, 784–85 (9th Cir. 2012) (finding that

17   district court properly granted motion to confirm where the arbitrator interpreted the

18   contract in "in light of the parties' acts and conduct").

19        The Court is unpersuaded by MRS's contrary contentions. MRS argues that the

20   oral agreement to Phases 2C and 2A was a "one-off dictated by extenuating

21   circumstances", and that "there was a written agreement for Phases 2C and 2A in the form

22   of the Phase 2B Work Order." (ECF NO. 42 at 3.) Additionally, MRS argues that

23   interpreting the MSA to require written changes to oral work orders is "impossible and

24   senseless." (*Id.*) Even assuming MRS is correct on these points, this argument is beyond

25   the instant scope of review because the Court is not permitted to determine the "rightness

26   or wrongness of the arbitrator's contract interpretation." *Aspic Eng'g & Constr. Co. v. ECC

27   Centcom Constructors LLC*, 913 F.3d 1162, 1166 (9th Cir. 2019); *see also Bosack*, 586

28   F.3d 1096 at 1106 (internal quotations omitted) ("Under the completely irrational doctrine,

1    the question is whether the award is irrational with respect to the contract, not whether the

2    [arbitrator]'s findings of fact are correct or internally consistent."). Having already found

3    that the arbitrator could have justifiably concluded that the MSA did not require work orders

4    to be in writing, the Court finds that the award is not completely irrational and vacatur is

5    therefore improper. *See Comedy Club*, 553 F.3d at 1289 (9th Cir. 2009) ("Because we

6    cannot say that there is no basis in the record for the arbitrator's decision, we hold that the

7    arbitrator's award is not completely irrational.").

8          MRS's claim that the arbitrator disregarded the law regarding material terms is also

9    unavailing. MRS's arguments relative to this issue fail for many of the same reasons

10   discussed *supra*. Chiefly, while MRS argues that the arbitrator acknowledged, but ignored,

11   the legal requirement that there be a meeting of the minds on all material terms to form a

12   contract[5], the evidence in the record shows otherwise. The arbitrator specifically

13   concluded that the parties agreed to the material terms for Phase 3 at the Meeting noted

14   *supra*. (ECF No. 25-1 at 9.) The arbitrator found that the principal topic of the Meeting—

15   which lasted roughly three and a half hours—was the 70/30 split. (*Id.* at 9–10.) Additionally,

16   the arbitrator found the testimony of GLA's witnesses regarding the 70/30 split more

17   credible than MRS's witnesses. (*Id.* at 10–11.) This finding also comports with handwritten

18   notes taken at the Meeting. (*Id.* at 10.)

19         In any event, because the evidence in the record shows that the arbitrator *applied*

20   the legal requirement that a contract must have a meeting of the minds on all material

21   terms, MRS's contention to the contrary is baseless. This Court concludes that MRS has

22   not demonstrated that vacatur is proper. The Court will therefore confirm the award and

23   enter judgment accordingly, as requested in the GLA Motion.

24         The Court will, however, deny GLA's request for an award of attorneys' fees. (ECF

25   No. 25 at 6.) Relying on NRS § 38.234, GLA claims that it should be granted attorneys'

26   fees and expenses incurred in bringing its motion. (*Id.*) But while § 38.234 seeks to

27

28         [5]*See e.g., Certified Fire Prot. Inc. v. Precision Constr.*, 283 P.3d 250, 255 (Nev. 2012); *May v. Anderson,* 119 P.3d 1254, 1257 (Nev. 2005).

6

promote a policy of finality of arbitration awards, this must be balanced with the "need to avoid unduly burden[ing] parties with the threat of fees when they have legitimate concerns about the legal validity of an award." *Summa Emergency Assocs., Inc. v. Emergency Physicians Ins. Co.*, No. 72913, 2018 WL 2041544, at *2 n.3 (Nev. App. Apr. 20, 2018) (quoting *Duke v. Graham*, 158 P.3d 540, 548 (Utah 2007)). Here, GLA moved for fees and to recover expenses before knowing what legal arguments MRS would offer in opposition to the GLA Motion. Regardless of GLA's motivations in requesting fees so prematurely, the Court finds that MRS legitimately raised its concerns regarding the award. The Court therefore concludes that the policy rationale for an award under § 38.234 supports a denial of fees here. GLA request for fees is accordingly denied.

## V.   CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the issues before the Court.

It is therefore ordered that Plaintiff Geo-Logic Associates, Inc.'s motion for confirmation of the arbitration award and entry of judgment (ECF No. 25) is granted, except on GLA's request for attorneys' fees and to recover expenses. The Clerk of the Court is directed to enter judgment as follows: (1) in favor of Plaintiff in the amount of $2,037,586.00, plus prejudgment interest accruing from September 13, 2017 until the judgment is paid in full; and (2) in favor of Plaintiff on Defendant's counterclaims.

It is further ordered that Defendant Metal Recovery Solutions, Inc.'s motion to partially vacate the arbitration award (ECF No. 30) is denied.

///

///

///

///

///

7

It is further ordered that Defendant Metal Recovery Solutions, Inc.'s motion to seal (ECF No. 29) is granted.

DATED THIS 6th day of January 2020.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE

# Exhibit 3

# Exhibit 3

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

GEO-LOGIC ASSOCIATES, INC.,

                Plaintiff,

    v.

METAL RECOVERY SOLUTIONS, INC.,
*et al.*,

                Defendants.

Case No. 3:17-cv-00563-MMD-WGC

ORDER

## I. SUMMARY

This action stems from the parties' dispute relating to contracts for engineering and technical services in connection with the mining of precious metals. The Court stayed this action to allow the parties to arbitrate their dispute, which resulted in an award that Defendant now challenges. There are two substantive motions pending before the Court. First, Plaintiff Geo-Logic Associates, Inc. ("GLA") moves to (1) confirm the arbitration award, asking the Court to enter judgment regarding the same, and (2) seeks attorneys' fees and expenses ("GLA Motion").[1] (ECF. No. 25.) Second, Defendant Metal Recovery Solutions, Inc. ("MRS") moves to partially vacate the final arbitration award before the Court rules on the GLA Motion ("Motion to Vacate"). (ECF. No. 30.)[2] For the reasons discussed below, the Court confirms the arbitration award and accordingly denies the Motion to Vacate. GLA's request for attorneys' fees is denied.

---

[1]The Court notes that GLA's "motions" were not properly filed as required by LR IC 2–2(b) because each contains a different request for relief. Nevertheless, the Court will address each request.

[2]MRS has separately moved to seal certain exhibits to the Motion to Vacate. (ECF No. 29.) This Court has previously sealed similar exhibits for both parties in this case, (ECF No. 55; ECF No. 56), and finds that the same reasoning applies to MRS's motion. Therefore, MRS's motion to seal is granted.

## II.     BACKGROUND

GLA is a geologic, geotechnical, civil and environmental firm with 25 offices in eight states and an affiliate office in Peru. (ECF No. 1 at 2.) MRS is metallurgical engineering firm based in Reno, Nevada. (ECF No. 32 at 5.) Dr. Thomas Seal is the CEO, CTO and majority owner of MRS. (*Id.*) Goldcorp Inc. ("Goldcorp") is a gold production company with headquarters in Vancouver, British Columbia, Canada. (ECF No. 25-1 at 6.)

In June 2015, MRS entered an agreement with Goldcorp to provide services and equipment at Goldcorp's Los Filos gold mine ("Mine") project in central Mexico. (*Id.*) In October 2015, MRS retained the services of GLA to provide personnel and manage the project. (*Id.*) Per a Master Services Agreement ("MSA") between the parties, the work would be carried out in designated phases. (ECF No. 25–1 at 6.) At a meeting on September 23, 2016 ("Meeting"), MRS and GLA discussed a 70/30 profit split between MRS and GLA for Phase 3 of the project. (ECF No. 32 at 15.) In December 2016, MRS began work on Phase 3 without GLA's services. (ECF No. 1 at 8; ECF No. 39-1 at 44–45.)[3]

On September 23, 2017, GLA filed this action, asserting claims against MRS and Dr. Seal. (ECF No. 1.) In lieu of proceeding in this Court, the parties stipulated to binding arbitration as to claims against MRS. (ECF No. 20.) During arbitration, MRS asserted counterclaims against GLA. (ECF No. 25-1 at 4.) The arbitrator ultimately found in GLA's favor, awarding GLA $2,037,586, plus prejudgment interest at the lawful rate accruing from September 13, 2017—the date of commencement of this action.[4] (ECF No. 25-1 at 4–13.)

GLA's Motion seeks confirmation of the arbitration award and an executable judgment against MRS. MRS argues in response that the arbitrator improperly decided

---

[3]Additional factual background can be found in the arbitration award. (ECF No. 25-1 at 5.)

[4]GLA states that as of the date the GLA Motion was filed—September 25, 2019—prejudgment interest is $288,164.90. (ECF No. 25 at 5.) MRS does not dispute GLA's prejudgment interest calculation methodology. (ECF No. 34 at 2.)

1    certain terms of the award and has separately moved to vacate those terms.

2    **III.    LEGAL STANDARD**

3           Review of an arbitration award is "both limited and highly deferential". *Comedy*

4    *Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1288 (9th Cir. 2009). Upon application for

5    confirmation of an arbitration award, "the court must grant such an order unless the award

6    is vacated, modified, or corrected . . .." 9 U.S.C. § 9. "The Federal Arbitration Act

7    enumerates limited grounds on which a federal court may vacate, modify, or correct an

8    arbitral award. Neither erroneous legal conclusions nor unsubstantiated factual findings

9    justify federal court review of an arbitral award." *Kyocera Corp. v. Prudential–Bache Trade*

10   *Serv. Inc.*, 341 F.3d 987, 994 (9th Cir. 2003) (internal citations omitted). Vacatur is

11   permitted "where the arbitrator[] exceeded [his] powers, or so imperfectly executed them

12   that a mutual, final, and definite award upon the subject matter submitted was not made."

13   9 U.S.C. § 10(a)(4). An arbitrator exceeds his powers "not when [he] merely interpret[s] or

14   appl[ies] the governing law incorrectly, but when the award is completely irrational, or

15   exhibits a manifest disregard of law." *Kyocera*, 341 F.3d at 997 (internal citations omitted).

16   However, "if, on its face, the award represents a plausible interpretation of the contract,

17   judicial inquiry ceases and the award must be enforced." *McKesson Corp. v. Local 150*

18   *IBT*, 969 F.2d 831, 833 (9th Cir. 1992).

19          "The completely irrational standard is extremely narrow and is satisfied only where

20   the arbitration decision fails to draw its essence from the agreement." *Comedy Club,* 553

21   F.3d at 1288 (quoting *Hoffman v. Cargill Inc.*, 236 F.3d 458, 461–62 (8th Cir. 2001)). To

22   determine if an arbitration award draws its essence from the agreement, courts view the

23   agreement in light of its "language and context, as well as other indications of the parties'

24   intentions." *Bosack v. Soward*, 586 F.3d 1096, 1106 (9th Cir. 2009) (quoting *McGrann v.*

25   *First Albany Corp.*, 424 F.3d 743, 749 (8th Cir. 2005)). Additionally, if there is a basis in

26   the record for the arbitrator's decision, it will not be deemed completely irrational. *See*

27   *Comedy Club*, 553 F.3d at 1289.

28          Manifest disregard of the law requires more than an error in interpretation or

3

1  application of the law. *Thompson v. Tega–Rand Int'l*, 740 F.2d 762, 763 (9th Cir. 1984)

2  (per curiam). "[M]ere allegations of error are insufficient." *Collins v. D.R. Horton, Inc.*, 505

3  F.3d 874, 879 (9th Cir. 2007) (quoting *Carter v. Health Net of California*, Inc., 374 F.3d

4  830, 838 (9th Cir. 2004)). Instead, it must be "clear from the record that the arbitrator[]

5  recognized the applicable law and then ignored it." *Mich. Mut. Ins. Co. v. Unigard Sec. Ins.*

6  *Co.*, 44 F.3d 826, 832 (9th Cir. 1995).

7  **IV.   DISCUSSION**

8  MRS asserts that the portion of the award finding that MRS and GLA entered into

9  an oral contract for Phase 3 of the Mine is irrational and manifestly disregards the law.

10  (ECF No. 30 at 2–3.) As to the former, MRS claims the arbitrator disregarded a

11  requirement in the MSA that work orders for the Mine had to be in writing. (ECF. No. 30 at

12  2.) As to the latter, MRS argues that the arbitrator ignored the requirement that there must

13  be a meeting of the minds on all material terms in order for a contract to be formed. (ECF.

14  No. 30 at 2–3.) The Court will address each contention in turn.

15  On the issue of irrationality, MRS specifically claims that the arbitrator disregarded

16  a requirement in paragraph 1 of the MSA that work orders had to be in writing. (ECF No.

17  30 at 8.) To support its argument, MRS notes that the award "does not consider or

18  reference the requirement" that work orders had to be in writing, and that the arbitrator

19  failed to "reference or consider" a "plethora of material evidence proffered by MRS on this

20  central issue . . .." (ECF. No. 30 at 5–6.) MRS contends that the award is therefore

21  completely irrational. The Court disagrees.

22  It is a universally accepted rule that arbitrators are not required to state the reasons

23  for their decisions. *A.G. Edwards & Sons, Inc. v. McCollough*, 967 F.2d 1401, 1403 (9th

24  Cir. 1992) (citing *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593,

25  598 (1960)). This rule "presumes the arbitrator[] took a permissible route to the award

26  where one exists." *Id.* at 1403.

27  Here, there is enough evidence in the record for the arbitrator to plausibly find that

28  oral agreements were permissible under the MSA. As an initial matter, while the MSA

4

1    provides that work will be "set out in work orders", it does not state that such work orders

2    need to be in writing. (*See generally* ECF No. 30-2 at 101–113.) Notably, the MSA does

3    explicitly provide that other agreements have to be in writing. For example, paragraph 1

4    of the MSA states that "[n]o change in the amount due or time of performance shall be

5    effective until approved in writing by MRS . . .." (*Id.*) Additionally, paragraph 4 of the MSA

6    states that "[u]nless MRS agrees to otherwise in writing, the Contractor shall provide the

7    Services only through the 'Key Individual' or 'Key Individuals' listed in a Work Order." (*Id.*

8    at 102.) Because the MSA specifically identifies when certain agreements must be written,

9    the arbitrator could plausibly conclude that the lack of such identification for work orders

10   meant that they were not required to be in writing.

11          Similarly, the arbitrator could have concluded that the parties had a course of

12   conduct for orally agreeing to work orders. Relevantly, Phase 2B had a written work order,

13   but the parties orally agreed to apply this work order to Phases 2C and 2A. (ECF No. 30-

14   2 at 48–49.) In light of the parties' past oral agreements, the arbitrator reasonably could

15   have concluded that the Phase 3 work order was not required to be in writing. *See Metzler*

16   *Contracting Co. LLC v. Stephens*, 479 F. App'x 783, 784–85 (9th Cir. 2012) (finding that

17   district court properly granted motion to confirm where the arbitrator interpreted the

18   contract in "in light of the parties' acts and conduct").

19          The Court is unpersuaded by MRS's contrary contentions. MRS argues that the

20   oral agreement to Phases 2C and 2A was a "one-off dictated by extenuating

21   circumstances", and that "there was a written agreement for Phases 2C and 2A in the form

22   of the Phase 2B Work Order." (ECF NO. 42 at 3.) Additionally, MRS argues that

23   interpreting the MSA to require written changes to oral work orders is "impossible and

24   senseless." (*Id.*) Even assuming MRS is correct on these points, this argument is beyond

25   the instant scope of review because the Court is not permitted to determine the "rightness

26   or wrongness of the arbitrator's contract interpretation." *Aspic Eng'g & Constr. Co. v. ECC*

27   *Centcom Constructors LLC*, 913 F.3d 1162, 1166 (9th Cir. 2019); *see also Bosack*, 586

28   F.3d 1096 at 1106 (internal quotations omitted) ("Under the completely irrational doctrine,

1  the question is whether the award is irrational with respect to the contract, not whether the

2  [arbitrator]'s findings of fact are correct or internally consistent."). Having already found

3  that the arbitrator could have justifiably concluded that the MSA did not require work orders

4  to be in writing, the Court finds that the award is not completely irrational and vacatur is

5  therefore improper. *See Comedy Club*, 553 F.3d at 1289 (9th Cir. 2009) ("Because we

6  cannot say that there is no basis in the record for the arbitrator's decision, we hold that the

7  arbitrator's award is not completely irrational.").

8       MRS's claim that the arbitrator disregarded the law regarding material terms is also

9  unavailing. MRS's arguments relative to this issue fail for many of the same reasons

10  discussed *supra*. Chiefly, while MRS argues that the arbitrator acknowledged, but ignored,

11  the legal requirement that there be a meeting of the minds on all material terms to form a

12  contract[5], the evidence in the record shows otherwise. The arbitrator specifically

13  concluded that the parties agreed to the material terms for Phase 3 at the Meeting noted

14  *supra*. (ECF No. 25-1 at 9.) The arbitrator found that the principal topic of the Meeting—

15  which lasted roughly three and a half hours—was the 70/30 split. (*Id.* at 9–10.) Additionally,

16  the arbitrator found the testimony of GLA's witnesses regarding the 70/30 split more

17  credible than MRS's witnesses. (*Id.* at 10–11.) This finding also comports with handwritten

18  notes taken at the Meeting. (*Id.* at 10.)

19       In any event, because the evidence in the record shows that the arbitrator *applied*

20  the legal requirement that a contract must have a meeting of the minds on all material

21  terms, MRS's contention to the contrary is baseless. This Court concludes that MRS has

22  not demonstrated that vacatur is proper. The Court will therefore confirm the award and

23  enter judgment accordingly, as requested in the GLA Motion.

24       The Court will, however, deny GLA's request for an award of attorneys' fees. (ECF

25  No. 25 at 6.) Relying on NRS § 38.234, GLA claims that it should be granted attorneys'

26  fees and expenses incurred in bringing its motion. (*Id.*) But while § 38.234 seeks to

27

28       [5]*See e.g., Certified Fire Prot. Inc. v. Precision Constr.*, 283 P.3d 250, 255 (Nev. 2012); *May v. Anderson,* 119 P.3d 1254, 1257 (Nev. 2005).

1   promote a policy of finality of arbitration awards, this must be balanced with the "need to
2   avoid unduly burden[ing] parties with the threat of fees when they have legitimate concerns
3   about the legal validity of an award." *Summa Emergency Assocs., Inc. v. Emergency*
4   *Physicians Ins. Co.*, No. 72913, 2018 WL 2041544, at *2 n.3 (Nev. App. Apr. 20, 2018)
5   (quoting *Duke v. Graham*, 158 P.3d 540, 548 (Utah 2007)). Here, GLA moved for fees and
6   to recover expenses before knowing what legal arguments MRS would offer in opposition
7   to the GLA Motion. Regardless of GLA's motivations in requesting fees so prematurely,
8   the Court finds that MRS legitimately raised its concerns regarding the award. The Court
9   therefore concludes that the policy rationale for an award under § 38.234 supports a denial
10  of fees here. GLA request for fees is accordingly denied.

11  **V.   CONCLUSION**

12          The Court notes that the parties made several arguments and cited to several cases
13  not discussed above. The Court has reviewed these arguments and cases and determines
14  that they do not warrant discussion as they do not affect the outcome of the issues before
15  the Court.

16          It is therefore ordered that Plaintiff Geo-Logic Associates, Inc.'s motion for
17  confirmation of the arbitration award and entry of judgment (ECF No. 25) is granted, except
18  on GLA's request for attorneys' fees and to recover expenses. The Clerk of the Court is
19  directed to enter judgment as follows: (1) in favor of Plaintiff in the amount of
20  $2,037,586.00, plus prejudgment interest accruing from September 13, 2017 until the
21  judgment is paid in full; and (2) in favor of Plaintiff on Defendant's counterclaims.

22          It is further ordered that Defendant Metal Recovery Solutions, Inc.'s motion to
23  partially vacate the arbitration award (ECF No. 30) is denied.

24  ///
25  ///
26  ///
27  ///
28  ///

7

It is further ordered that Defendant Metal Recovery Solutions, Inc.'s motion to seal (ECF No. 29) is granted.

DATED THIS 6th day of January 2020.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE

# Exhibit 4

# Exhibit 4

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

GEO-LOGIC ASSOCIATES, INC.,

v.

METAL RECOVERY SOLUTIONS, INC., et al.

)
)
)
)
)
)
)
)
)
)

3:17-cv-00563-MMD-WGC
_____
Case Number

WRIT OF EXECUTION
AND GARNISHMENT

TO THE UNITED STATES MARSHAL FOR THE DISTRICT OF NEVADA:

On January 6, 2020 , a Judgment was entered in the docket of the above-entitled Court and action, in favor of Geo-Logic Associates, Inc. as Judgment Creditor,

and against Metal Recovery Solutions, Inc. as Judgment Debtor, for

$ 2,037,586.00     principal,

$ _____     attorney fees,

$ 329,468.49     interest, and

$ _____     costs making a total of

$ 2,367,054.49     JUDGMENT AS ENTERED.

WHEREAS, according to an affidavit and request for issuance of writ of execution filed herein, it appears that further sums have accrued since the entry of judgment, to wit:

$6,052.15     accrued interest, and

$ _____     accrued costs and fees, making a total of

$ 6,052.15     ACCRUED INTEREST, COSTS AND FEES.

CREDIT must be given for payments and partial satisfactions in the amount of $ 168,572.60 _____ which is to be first credited against the total accured interest, costs and fees, with any excess credited against the Judgment as entered, leaving a net balance of

$ $2,206,803.60 _____ ACTUALLY DUE on the date issuance of this writ, of which

$ 2,198,481.89 _____ is due on the Judgment as entered, and bears interest at 1.57 ____ % per annum, in the amount of $ 94.56 _____ PER DAY, from the date of entry of judgment to the date of issuance on this writ, to which must be added the accrued costs and fees and the commissions and costs of the officer executing this writ. (Interest rate and amount per day to be completed by attorney.)

Notice by mail of any sale under the writ of execution   ○ Has   ● Has Not   been requested. The following named persons have requested such notice of sale:

NAME                          ADDRESS

YOU ARE THEREFORE COMMANDED to satisfy the said Judgment with interest and costs as provided by law and your costs and disbursements out of the personal property of said debtor, except that for any pay period, 75 percent of the disposable earnings of the debtor during this period or for each week of the period 30 times the minimum hour wage prescribed by section 6(a)(1) of the Federal Fair Labor Standards Act of 1938 [29 U.S.C. Sec. 206(a)(1)], and in effect at the time the earnings are payable, whichever is greater, is exempt from any levy of execution pursuant to this writ, and if sufficient personal property cannot be found, then out of his real property; or if the Judgment be a lien upon real property, then out of the real property belonging to such debtor, and make return of this writ within not less than ten (10) days nor more than sixty (60) days after your receipt thereof with what you have done endorsed hereon.

Judgment Creditor/Plaintiff will identify to the U.S. Marshal or his representative assets that are to be seized to satisfy the judgment/order.

YOU ARE FURTHER COMMANDED if necessary, to turn over any property seized under this order to a third party custodian or to the plaintiff. The U.S. Marshal or his representative is authorized to use reasonable force in the execution of this Judgment/Order and the Judgment Creditor/Plaintiff will hold the U.S. Marshals Service harmless of any liability that may be imposed as a result of the execution of the Judgment.

4/3/2020

Date: _____

CLERK OF COURT

*Signature of Clerk or Deputy Clerk*

# EXHIBIT 5:
## Declaration of Dr. Seal, Arbitration (5/31/2018)

# FILED UNDER SEAL

# CONFIDENTIAL

# EXHIBIT 5

# EXHIBIT 6:
## Transcript of Dr. Thomas Seal (3/3/2020)

## FILED UNDER SEAL

## CONFIDENTIAL

## EXHIBIT 6

# Exhibit 7

# Exhibit 7

1  Michael D. Rounds
   Nevada Bar No. 4734
2  Adam K. Yowell
   Nevada Bar No. 11748
3  BROWNSTEIN HYATT FARBER SCHRECK, LLP
   5371 Kietzke Lane
4  Reno, NV 89511
   Telephone: 775.324.4100
5  Facsimile: 775.333.8171
   Email: mrounds@bhfs.com
6         ayowell@bhfs.com

7  *Attorneys for Defendants*
   *Metal Recovery Solutions, Inc.,*
8  *and Thom Seal, Ph.D.*

9

                  **UNITED STATES DISTRICT COURT**

10

                        **DISTRICT OF NEVADA**

11

12  GEO-LOGIC ASSOCIATES, INC., a        CASE NO.:  3:17-cv-00563-MMD-WGC
    California corporation,
13
                      Plaintiff,          **DECLARATION OF**
14                                         **DR. THOM SEAL**
    v.
15
    METAL RECOVERY SOLUTIONS,
16  INC., a Nevada corporation, and THOM
    SEAL, PH.D., an individual,
17
                      Defendants.
18

19        I, Thom Seal, Ph.D., hereby declare as follows:

20        1.     I am the Chief Executive Officer, President and Chief Technology Officer of

21  Metal Recovery Solutions, Inc.  I have personal knowledge of the matters set forth in this

22  declaration.

23        2.     I submit this declaration in support of Metal Recovery Solutions, Inc.'s Opposition

24  to Plaintiff's Emergency Motion for Preliminary Injunction to Prevent Transfer or Dissipation of

25  Assets; and for Order Allowing the Filing of First Amended and Supplemental Complaint

26  ("Motion").  I have reviewed the accompanying declarations of Messrs. Oines and Morrow, and

27  have the following response.

28

                                            1

BROWNSTEIN HYATT FARBER SCHRECK, LLP
5371 Kietzke Lane
Reno, NV 89511
775.324.4100

3.      I am 69 years old.  I have been involved in mining for more than forty years, and have a Ph.D. in Mining Engineering with a Metallurgy emphasis.

4.      In 2009, I became a full-time professor at the Mackay School of Earth Sciences and Engineering ("Mackay School") at the University of Nevada.  My current teaching contract is through June 2020.   I have no current intention to retire from teaching, and will likely continue with a part-time position after my current contract expires.  I will also continue with my groundbreaking research and development of technology to remediate the long-term environmental impact of mining in Nevada. I have never sat on the Advisory Board of the Mackay School, as Mr. Morrow states in paragraph 2 of his declaration, and therefore have never resigned therefrom.

5.      My wife Jette and I purchased the property located at 169 Cascade Drive, Spring Creek, Nevada in 1995, and moved into the home we built thereon in 1996.   The reason we purchased this property and home is because we both worked at the nearby Newmont mine in Carlin, Nevada.  The home was paid off in 2007.

6.      Metal Recovery Solutions, Inc. ("MRS") was formed in 2009 to perform a heap leach mining project at the Cripple Creek mine in Colorado Springs, Colorado.  Since its inception, I have been an officer and director and have served various roles such as CEO, President, CTO, Secretary and Treasurer of MRS.  Jette Seal has been the Secretary and Treasurer since 2017, when she retired from Newmont.  We are the only shareholders.  The primary reason MRS listed 169 Cascade Drive as the address for MRS is that MRS could (and did) store its "Hydro-Jex" trailers and equipment that it used in its heap leach mining operations at that location when not used in heap leach mining operations.  In addition, MRS performs its services on-location at heap leach mining sites, and has no need for a separate office to perform simple book-keeping and record-keeping functions.

BROWNSTEIN HYATT FARBER SCHRECK, LLP
5371 Kietzke Lane
Reno, NV 89511
775.324.4100

7.      My wife Jette retired from Newmont as a senior metallurgical technician in 2017. There was then no need for us to keep our home located at 169 Cascade Drive at that point, and we intended to sell it as soon as we reasonably could.  We were too busy with MRS' business and the litigation to do so, however, so we did not list it for sale until October, 2019 after the arbitration was completed.   The property and home have recently been sold in the last two weeks, and the sale was entirely unrelated to the arbitration or this action.

8.      My wife Jette and I own another home located at 3565 Rock Ridge Court in Reno, Nevada, 89512, in close proximity to the University of Nevada.  We purchased it in 2012 and it now serves as our full-time home.  We are not moving to Oregon, as Mr. Morrow claims he heard from SME members in paragraph 2 of his declaration.  We have also recently listed our Rock Ridge Court home as the address for MRS at the Nevada Secretary of State.  This change in address for MRS will not negatively affect MRS in any way.

9.      MRS has observed corporate formalities since its inception, including meeting minutes, a separate bank account for revenue and payments, yearly financial statements, tax returns, and tax payments.  MRS has, without exception, paid every uncontested bill that was due and owing since its inception.  Jette and I have been paid salaries and received distributions from time to time when MRS was generating business, but we have never comingled our own funds with MRS' account, and we have never used MRS' assets or money for personal use.  MRS has always been, and continues to be, its own stand-alone entity.

10.      As indicated in the Award, MRS discussed a joint venture agreement with GLA almost from the inception of the parties' relationship through its completion.  Among the terms discussed were a jointly-owned MRS/GLA entity that was licensed for a fee to use the Hydro-Jex patent(s) from its owner, Differential Engineering, and a profit split arrangement between MRS and GLA that resulted from heap leach mining projects that they worked on together.  In short,

3

BROWNSTEIN HYATT FARBER SCHRECK, LLP
5371 Kietzke Lane
Reno, NV 89511
775.324.4100

MRS was seeking to find a partner who could solicit and find heap leach mining business for the Hydro-Jex technology, and MRS' role would be limited to constructing trailers and training employees in operating the Hydro-Jex system.

11.    MRS has not been sold, as Mr. Morrow alleges he has heard from unnamed third parties in paragraphs 2 and 3 of his declaration. Among several other aspects of doing business and supporting the Hydro-Jex Technology worldwide, MRS has leased two Hydro-Jex trailers (4G1 and 4G2) and related equipment to a third party for use in heap leach mining projects that it solicits and secures. MRS has no ownership or other interest in this third party. MRS has not as of yet received any revenue from the lease.

12.    MRS is currently attempting to secure heap leach mining projects with Labris Madencilik ve San. Ltd. Sti. ("Labris"), a Turkish company that conducts mining operations that MRS has previously done business with. MRS is in discussions with three different mines in the area in and around Turkey and believes that it is likely that it will do work for at least one of these mines. The revenue from even one of these heap leach projects would far exceed the amount of the Award that MRS is seeking to vacate.

13.    It would be enormously burdensome and perhaps fatal to MRS' business for MRS to have to seek Court approval for every business expense exceeding $1,000. Mining projects move fast in this business, and MRS will have to front expenses for services and equipment and travel to foreign countries such as Mexico or Turkey on short notice. MRS may also have to build additional trailers that may cost $500,000 or more, and will have to pay for pumping plus expenses, travel and labor until MRS' invoices are paid, which often take 6 months or more. MRS may also be required to hire new employee(s) for mining projects on short notice. If there is any delay in any of these expenditures, MRS could easily lose business altogether.

1    I declare under penalty of perjury that the foregoing is true and correct.

2    DATED: December 6, 2019

3                                              THOM SEAL, PH.D.

5

# EXHIBIT 8:
## Declaration of Dr. Seal (2/4/2020)

## FILED UNDER SEAL

## CONFIDENTIAL

## EXHIBIT 8

# Exhibit 9

# Exhibit 9

## ENTITY INFORMATION

### ENTITY INFORMATION

**Entity Name:**

DIFFERENTIAL ENGINEERING INC.

**Entity Number:**

E0100512008-4

**Entity Type:**

Domestic Corporation (78)

**Entity Status:**

Active

**Formation Date:**

02/11/2008

**NV Business ID:**

NV20081039254

**Termination Date:**

Perpetual

**Annual Report Due Date:**

2/28/2021

### REGISTERED AGENT INFORMATION

**Name of Individual or Legal Entity:**

THOM SEAL PHD PE

**Status:**

Active

**CRA Agent Entity Type:**

**Registered Agent Type:**

Non-Commercial Registered Agent

**NV Business ID:**

**Office or Position:**

**Jurisdiction:**

**Street Address:**

3565 ROCK RIDGE CT, RENO, NV, 89512, USA

**Mailing Address:**

**Individual with Authority to Act:**

**Fictitious Website or Domain Name:**

**OFFICER INFORMATION**

☐ VIEW HISTORICAL DATA

| Title | Name | Address | Last Updated | Status |
|---|---|---|---|---|
| President | Thom Seal | 3565 Rock Ridge Ct., Reno, NV, 89512, USA | 03/17/2020 | Active |
| Secretary | JETTE C SEAL | 3565 ROCK RIDGE CT, RENO, NV, 89512, USA | 01/07/2019 | Active |
| Treasurer | JETTE C SEAL | 3565 ROCK RIDGE CT, RENO, NV, 89512, USA | 01/07/2019 | Active |

| Title | Name | Address | Last Updated | Status |
|-------|------|---------|--------------|--------|
| Director | THOM SEAL | 3565 ROCK RIDGE CT, RENO, NV, 89512, USA | 01/07/2019 | Active |
| President | DR. THOM SEAL, PE | 3565 ROCK RIDGE CT, RENO, NV, 89512, USA | 12/22/2017 | Active |

**Page 1 of 1, records 1 to 5 of 5**

## CURRENT SHARES

| Class/Series | Type | Share Number | Value |
|--------------|------|--------------|-------|
| | Authorized | 7,500,000 | 0.010000000000 |

**Page 1 of 1, records 1 to 1 of 1**

Number of No Par Value Shares:

**0**

Total Authorized Capital:

**75,000**

Filing History          Name History          Mergers/Conversions

Return to Search          Return to Results

# Exhibit 10

# Exhibit 10

*BARBARA K. CEGAVSKE*
*Secretary of State*

**STATE OF NEVADA**



*Commercial Recordings Division*
*202 N. Carson Street*
*Carson City, NV 89701*
*Telephone (775) 684-5708*
*Fax (775) 684-7138*

*North Las Vegas City Hall*
*2250 Las Vegas Blvd North, Suite 400*
*North Las Vegas, NV 89030*
*Telephone (702) 486-2880*
*Fax (702) 486-2888*

*KIMBERLEY PERONDI*
*Deputy Secretary for*
*Commercial Recordings*

**OFFICE OF THE**
**SECRETARY OF STATE**

# UCC Search Report

The Nevada Secretary of State hereby certifies that the attached list is a true and exact list of all financing statements or federal tax liens and related subsequent documentation for the debtor below as filed with the Secretary of State's office, Uniform Commercial Code Division, as of the Through Date below.

**Date Searched:** 7/31/2020 10:03:05 AM   **Search Criteria:**
**Searched by:** Amanda Camacho
**Filing Chains:** 1

**Good Through Filing Date:** 06/30/2020

**Date Range:** All Available Filings
**Include Filings Outside Range?:** All Available Filings

**Filing Status:** ALL(Lapsed and Unlapsed)
**Include Records:** N/A

**Organization:** METAL RECOVERY SOLUTIONS, INC.

**Cities:**

---

**Filing Chain#:** 1
**Original File#:** 2019033291-7

**Lapse Date:** 08/07/2024
**Lien Type:** UCC Lien

---

**Filing #:** 2019033291-7    **Filing Date:** 08/07/2019 07:39 PM    **Filing Type:** Initial Financing Statement UCC-1    **Page Count:** 1

**Debtors**

| Name | Type | Address |
|------|------|---------|
| METAL RECOVERY SOLUTIONS, INC. | Organization | PO BOX 8353 SPRING CREEK, NV 89815, USA |

**Secured Parties**

| Name | Type | Address |
|------|------|---------|
| DIFFERENTIAL ENGINEERING INC. | Organization | 3565 ROCK RIDGE CT. RENO, NV 89512, USA |

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional) | |
| **Thom Seal** | |
| B. E-MAIL CONTACT AT FILER (optional) | |
| **tseal@unr.edu** | |
| C. SEND ACKNOWLEDGMENT TO: (Name and Address) | |
| **JETTESEAL@GMAIL.COM** | |

| Filed in the Office of | Filing Number |
|---|---|
| *Barbara K. Cegavske* | **2019033291-7** |
| | Initial Filing Number |
| Secretary | **2019033291-7** |
| State Of Nevada | Filed On |
| | **August 7, 2019 07:39 PM** |
| | Lapse Date |
| | **08/07/2024** |
| | Number of Pages |
| | **1** |

1. DEBTOR'S NAME: Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| OR | 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | **METAL RECOVERY SOLUTIONS, INC.** | | | |
| | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **PO BOX 8353** | **SPRING CREEK** | **NV** | **89815** | **USA** |

2. DEBTOR'S NAME: Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| OR | 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | | | | |
| | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only <u>one</u> Secured Party name (3a or 3b)

| OR | 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | **DIFFERENTIAL ENGINEERING INC.** | | | |
| | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **3565 ROCK RIDGE CT.** | **RENO** | **NV** | **89512** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

**NOTE: METAL RECOVERY SOLUTIONS, INC. OWES DIFFERENTIAL ENGINEERING INC. $776,858 FOR PATENT LICENSE FEE USED SINCE JUNE, 2015 AND HAS NOT PAID AS OF AUG 1, 2019. THE INTEREST ON THIS NOTE IS 6% ANNUAL AND PAYABLE JANUARY 3, 2022 IN FULL. THIS NOTE IS SECURED BY METAL RECOVERY SOLUTIONS INC.'S CASH AND EQUIPMENT LISTED BELOW AND INCLUDES: PARTS, SUPPLIES, PIPE, TOOLS, GENERATORS, AND ALL EQUIPMENT REQUIRED FOR FULL OPERATIONS OF THE PUMPING UNIT AS DESIGNED.**
**1. MRS CASH IN BANK ACCOUNTS**
**2. MRS 4G1 TRAILER: VIN 1B9CA192X..., INCLUDING CAT-GLOBAL PUMP, PARTS, SUPPLIES, TOOLS, PIPE, FITTINGS, ETC.**
**3. MRS 4G TRAILER: VIN 1B9CA1928..., INCLUDING CAT-GLOBAL PUMP, PARTS, SUPPLIES, TOOLS, PIPE, FITTINGS, ETC.**

5. Check <u>only</u> if applicable and check <u>only</u> one box: Collateral is ☑ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

| 6a. Check <u>only</u> if applicable and check <u>only</u> one box: | | | 6b. Check <u>only</u> if applicable and check <u>only</u> one box: | |
|---|---|---|---|---|
| ☐ Public-Finance Transaction | ☐ Manufactured-Home Transaction | ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien | ☐ Non-UCC Filing |

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☑ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

# Exhibit 11

# Exhibit 11

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

GEO-LOGIC ASSOCIATES, INC.,　　　)
　　　　　　　　　　　　　　　　)　　CASE NO.  3:20-cv-00180-MMD-WGC
　　　　　　　　Plaintiff,　　　　)
vs.　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)　　MINUTES OF PROCEEDINGS
METAL RECOVERY SOLUTIONS, INC., )
et al.　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　Defendant(s).　　)
　　　　　　　　　　　　　　　　)　　DATED: June 9, 2020
_____)

PRESENT:　THE HONORABLE WILLIAM G. COBB, U.S. MAGISTRATE JUDGE

DEPUTY CLERK:　 KAREN WALKER 　　REPORTER:　 NONE APPEARING

COUNSEL FOR PLAINTIFF(S):　Ronald Oines, Esq.

COUNSEL FOR DEFENDANT(S):　Michael Rounds, Esq. and Adam Yowell, Esq.

**MINUTES OF PROCEEDINGS:　TELEPHONIC DISCOVERY HEARING**

10:04 a.m. Court convenes.

The court hold today's hearing regarding Defendants' Motion to Stay Discovery (ECF No. 29) and the Stipulated Discovery Plan and Scheduling Order (ECF No. 30).

The court advises that the resolution of the Stipulated Discovery Plan and Scheduling Order (ECF No. 30) is dependent on how the Motion to Stay Discovery (ECF No. 29) is decided, and notes that the parties have not stipulated to anything of significance.

The court turns to Defendants' Motion to Stay Discovery (ECF No. 29) which implicates the Motion to Dismiss (ECF No. 18) and the underlying case *Geo-Logic Associates,*

*Inc. v. Metal Recovery Solutions, Inc. et al.*, 3:17-cv-00563-MMD-WGC (referred herein as "the 563 case").

The court summarizes the events taken place in the 563 case, noting the case was referred to binding arbitration, before Judge Pro, pursuant to Stipulation and Order (ECF No. 20). The court questions the parties as to what occurred with Defendant Dr. Seal in the binding arbitration as Judge Pro noted in the arbitration award that the action commenced against MRS and Dr. Seal, but the award was only against MRS. The court also states that District Judge Du's order confirming the arbitrator's award confirmed the award in favor of Plaintiff, but the order does not mention which defendant. The judgment (ECF No. 58), the writ of execution (ECF No. 92) and the appeal only refers to MRS only.

Mr. Oines states that Dr. Seal was named as a Defendant in the 563 complaint and when the case went to binding arbitration Geo-Logic Associates, Inc. (GLA) did not pursue any claims against Dr. Seal individually. Only claims between GLA and MRS proceeded through binding arbitration. Mr. Oines advises the claim against Dr. Seal in the 563 complaint was for trade secret misappropriation which GLA did not pursue in arbitration. Mr. Oines states that Dr. Seal was not part of the breach of contract claim that was arbitrated and there was no formal dismissal of Dr. Seal in the 563 case.

Mr. Yowell advises that when the case was referred for binding arbitration the Plaintiff submitted an arbitration complaint which did not include the trade secret claim against Dr. Seal. The parties treated the *sudo* amended complaint effectively as a dismissal against Dr. Seal. There are a few indications in the arbitrator's award disposing of all claims against Dr. Seal. Mr. Yowell states that Judge Pro noted that although Dr. Seal was a defendant in the arbitration,

there were no judgments against Dr. Seal and the only judgement was against MRS pertaining to the contract claims.

Mr. Oines agrees with Mr. Yowell except Judge Pro did not acknowledge Dr. Seal as a defendant in the arbitration as the case was not arbitrated against Dr. Seal individually but did acknowledge GLA was not pursuing claims against Dr. Seal in the arbitration. Mr. Oines agrees that GLA's original complaint in the 563 case against Dr. Seal was only as to the trade secret claim for relief.

The court questions the parties regarding District Judge Du's denial of the Motion for Preliminary Injunction/Amend (ECF No. 47) indicating the motion to amend may have some bearing on the Motion to Stay Discovery (ECF No. 29) in this case. Mr. Oines states that at the time the motion was heard, December 20, 2019, the arbitration award had not been confirmed to judgement. Mr. Oines believes District Judge Du felt that motion to amend was premature since a judgment had not been entered and MRS had not been faced with a judgment and refused to pay it. It would be Plaintiff's position that if the motion to amend was premature as to the alter-ego theory or was not ripe because MRS had not refused to pay a judgment, Plaintiff would have grounds to pursue the alter-ego claim in this case.

Mr. Yowell generally agrees with Mr. Oines' characterization of the December 20, 2019 hearing and believes District Judge Du reserved her ruling on whether or not there was merit to the alter-ego claim. The parties both understood that District Judge Du's ruling was not in any way prejudicial to GLA being able to move again later in the same case to amend the complaint to assert the alter-ego claim. Mr. Yowell advises that GLA was specifically asking for alter-ego liability on the judgment and a judgment was not entered at that time.

The court's interpretation, without the benefit of minutes or a written order of the proceeding on the motion to amend, is that there can be a reasonable inference drawn that there is justification for GLA to proceed with the alter-ego claim in the current case which has bearing on the Motion to Stay Discovery (ECF No. 29).

The court discusses the Motion to Dismiss (ECF No. 18) in the current case and the court's requirement to weigh the merits of the Motion to Dismiss because the arguments regarding stay of discovery are predicated upon the pending motion.

Mr. Yowell states Defendants moved for dismissal with prejudice of the alter-ego claim under the claims preclusion and moved for dismissal without prejudice of all four claims for failure to state a claim.  Defendants' Motion to Stay Discovery (ECF No. 29) is requesting partial stay applicable to only the discovery under the alter-ego cause of action because of the distinction between dispositive and non-dispositive grounds.  Mr. Yowell states the three non-alter-ego claims (fraud, fraudulent transfer, and improper distribution) pertain to four (4) discrete transactions and whether these transactions were improper to the three asserted claims. With respect to the alter-ego claim, the discovery would involve all transactions between MRS and Dr. and Mrs. Seal for over three years. Mr. Yowell states that the level of inquiry and discovery is broader and more invasive with the alter-ego claim in comparison with the discrete transactions asserted in the non-alter-ego claims.

Mr. Oines states the transactions Mr. Yowell refers to are the largest transactions, but there are other transactions.  Mr. Oines believes that there is substantial overlap with the non-alter-ego claims and alter-ego claim, and it would be inefficient to separate discovery to the non-alter-ego claims.  Mr. Oines states that Judge Du's denial did not preclude Plaintiff to pursue an alter-ego claim after the judgment had been entered.

A discussion takes place regarding the alter-ego claim and the issue as to whether that claim should have been brought in the first case or the current case. Mr. Yowell states that both parties, in their briefing on the motion to dismiss, cited case law supporting their position, but no case supports the fact pattern in this case. Mr. Yowell argues that GLA is barred from proceeding with an alter-ego claim as there are two unique and critical facts that do not show up in the cited case law which is (1) Dr. Seal was named personally as a defendant in the 563 case and, (2) is the breadth stipulation for arbitration which required GLA to bring every claim that it raised or could have raised against MRS or Dr. Seal at the time of the arbitration. Mr. Yowell states that the case law cited by Mr. Oines supports GLA could have brought the alter-ego cause of action in the 563 case and the resulting arbitration. Mr. Yowell further states that the fact there has been cases where the alter-ego claim was brought after the judgment in the same case goes against the inference of Judge Du's ruling that there was any sort of approval that GLA can proceed with an alter-ego claim. The existence of the cases indicating an alter-ego can proceed under similar circumstances, without the two particular critical factors that swing the outcome in this case, and Judge Du's ruling deferring this issue and all judgment on the arguments made therein, the conclusion cannot be drawn that the alter-ego claim was going to be allowed to proceed later.

Mr. Oines states that if MRS and Dr. Seal believed the stipulation was broad and covered an alter-ego claim, it would have been appropriate for Defendants to move or stipulate to have the alter-ego issue arbitrated. Mr. Oines does believe that it is inappropriate to argue that the alter-ego claim is barred by res judicata. Mr. Oines states that he does not believe MRS cited any cases that stand for the proposition that the circumstances in this case, or any other

case, where res judicata was argued that it applies to alter-ego claims. MRS briefing generally deals with describing what claim preclusion and res judicata is.

The court discusses Judge Pro's arbitration award noting that only MRS filed an answer and counterclaim and it appears the claims against Dr. Seal were not included. Mr. Yowell states that the stipulation referring the 563 case to binding arbitration required all causes of action alleged and may be alleged against Dr. Seal also proceed through arbitration. Mr. Yowell states if the causes of action that were raised against Dr. Seal in the 563 case are barred by res judicata, then the parties are agreeing, despite the absence of a formal dismissal with prejudice, Dr. Seal was essentially dismissed with prejudice even if the dismissal was not effective until the arbitrator's award.

The court advises that in order to decide the Motion to Stay Discovery (ECF No. 29), the court necessarily has to look at the Motion to Dismiss (EFC No. 18). If the court were to address the Motion to Dismiss (ECF No. 18), the court would deny the claim that res judicata bars the alter-ego allegations in the amended complaint in this case. The court may grant the motion with respect to the efficiency of the allegations for alter-ego, fraudulent transfer, constructive fraud, and improper distribution but with leave to amend to correct any perceived deficiencies. On the other hand, the court could also envision a scenario where those motions are denied and conduct discovery to determine exactly what those claims pertain to. Another reason, the court might deny the res judicata claim is that there was an attempt in the 563 case which was denied. The court is more persuaded with the cases that allow the use of the two-step approach for alter-ego to (1) to get a judgment against the corporate entity and then, (2) proceed against the principles of the corporate entity under the theory of alter-ego or piercing the corporate vail. Turning to the Motion to Stay Discovery (ECF No. 29), to the extent the

motion is predicated upon the theory that claim preclusion or res judicata bars the alter-ego theory, should be denied.  The court notes that if the claims of fraudulent transfer, constructive fraud and improper distribution were allowed to proceed, discovery would be difficult without involving the intertwined alter-ego claim.  As such,

IT IS ORDERED that the Motion to Stay Discovery (ECF No. 29) is **denied** as the court finds staying discovery leads to extraordinary delay in the case.

The court next turns to the Stipulated Discovery Plan and Scheduling Order (ECF No. 30) with competing dates and questions the parties regarding experts.  Mr. Oines advises Plaintiff may have one expert but is unsure at this time.  Mr. Yowell advises that Defendants may have at least one expert providing expert testimony regarding business type judgments and decisions.

The court states that there may be some merit to doing factual discovery prior to disclosing expert but that scenario is not consistent with Local Rule 26-(b)(3).  The court is inclined to provide an extended time for discovery.

IT IS FURTHER ORDERED that the court will set the following discovery deadlines:

| | |
|---|---|
| Discovery Cut-off: | **March 31, 2021** |
| Amend the pleadings or join parties: | **October 30, 2020** |
| Initial Expert Disclosure: | **January 29, 2021** |
| Rebuttal Expert Disclosure: | **February 26, 2021** |
| Dispositive Motions: | **April 30, 2021** |
| Joint Pre-trial Order: | **May 28, 2021**. |

In the event dispositive motions are filed, the deadline for filing the proposed joint pretrial order will be suspended until thirty (30) days after decision on the dispositive motions or further court order.

### Objections to an Order

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(A) and Rule IB 3-1 of the Local Rules of Practice, specific written objections to the court's orders and rulings as set forth in these minutes within fourteen (14) days after service of the Minutes of Proceedings. These objections should be titled "Objections to Magistrate Judge's Order" and should be accompanied by points and authorities for consideration by the District Judge.

2. That these Minutes of Proceedings is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1), Fed. R. App. P., should not be filed until entry of the District Court's judgment.

   There being no additional matters to address at this time, court adjourns at 11:25 a.m.

   **IT IS SO ORDERED.**

                                          DEBRA K. KEMPI, CLERK

                                          By: _____/s/_____
                                                  Deputy Clerk

# EXHIBIT 12:
## Transcript of JAMS Proceedings, Day 2
## (5/29/2019)


# FILED UNDER SEAL


# CONFIDENTIAL


# EXHIBIT 12