MICHAEL LEHNERS, ESQ.
429 Marsh Ave.
Reno, Nevada 89509
Nevada Bar Number 003331
(775) 786-1695
email michaellehners@yahoo.com
Attorney for Plaintiff Chapter 7 Trustee
Christopher P. Burke

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

oOo

IN RE

METAL RECOVERY SOLUTIONS, INC., aka MRS, INC,

Debtor(s).
_______________________________/

BK-N- 20-50660-GS
CHAPTER 7

Hearing Date: 3/24/23
and Time: 9:30 a.m.
Mtn No. ___________

MOTION TO APPROVE SALE OF CLAIMS AND OTHER BANKRUPTCY ESTATE ASSETS

Chapter 7 Trustee, Christopher P. Burke, files the following Motion to Approve Sale of Claims and Other Bankruptcy Estate Assets to Geo-Logic Associates, Inc. (Herein "Geo-Logic") for the lump sum of $1,150,000 cash.

## 1. Background

On January 6, 2020 Geo-Logic recovered a judgment against the Debtor for $2,037,586. The Debtor thereafter filed this Chapter 7 Bankruptcy on July 6, 2020. According to the schedules, Thom Seal owns 95% of the Debtor's stock, and his wife, Jette Seal, owns the remaining 5%.

In its schedules (ECF 1) the Debtor listed $1,417,989 in assets and $3,945,243[1]. in liabilities. The assets are primarily bank accounts, the two trailers, and the right to use the Hydro-Jex technology. Each trailer is used in conjunction with the Hydro-Jex technology. The Debtor has valued each trailer in its schedules at $500,000.

[1] Some of this liability consisted of claims filed by Differential Engineering, which have been since disallowed.

The Hydro-Jex technology is a patented process which allows recovery of valuable metals from ore tailings (actually mature leach heaps). The technology uses complex chemical processes to obtain these metals. The patent(s) are owned and/or controlled by Differential Engineering, Inc. (Herein "Differential"). Dr. Seal owns 100 percent of Differential, making that corporation an affiliate under 11 U.S.C. §101(2)(B). More than 20% of Differential's securities are held, with the power to vote, by an entity (Dr. Seal) who also has the power to vote more than 20% of the Debtor's voting securities.

A. LICENSE AND LEASE AGREEMENTS

On July 23, 2019 Differential and Jex Technologies Corporation (Herein "Jex") executed a Technology License Agreement (Herein "License Agreement"). This License Agreement has been sealed.

On July 31, 2019 the Debtor and Jex executed a Lease with Purchase Option Agreement for two trailers (4G1 and 4G2) and ancillary equipment/supplies (the crew trailer, the Chevy Pickup and all spare parts, job computer, and supplies). (Herein "Lease Agreement").

Exhibit "B" of the Lease Agreement describes the payment schedule. Jex is to pay the Debtor a minimum of $6,700 per month. This amount is increased to $16,700 per month for any month in which both trailers are working at a client's mine or mines. When the lease payments total $1,000,000, the two trailers and equipment shall be transferred to Jex. A copy of the Lease Agreement has been attached hereto as Exhibit "1".

B. DIFFERENTIAL ENGINEERING'S CLAIMS

On October 20, 2020 Differential Engineering filed two proofs of claim in the Debtor's bankruptcy case. Claim No. 2 was in the amount of $958,707. The stated consideration was consulting fees. The claim allegedly was secured. The collateral was listed as bank accounts and MRS trailers.

On that same day, Differential filed its second claim. Claim No. 3 was in the amount of $776,858 The stated consideration was a patent license obligation owed by the Debtor. The claim allegedly was secured. The collateral was listed as bank accounts and the Debtor's trailers.

Geo-Logic had objected to the validity of the claims themselves and the amounts owed in both of Differential's proofs of claims. The Chapter 7 Trustee had filed an adversary complaint (described below). Two of the Trustee's claims for relief concerned the nature, validity, priority, and extent of Differential's purported Article Nine security interests. The Trustee was allowed to participate, in a limited capacity, in Geo-Logic's claim objections.

On March 31, 2022, the Bankruptcy Court entered a final order which sustained Geo-Logic's omnibus objection and disallowed Differential's two claims (ECF 203). That order had been appealed to the Bankruptcy Appellate Panel for the Ninth Circuit by Differential. See BAP No. NV-22-1081-BFL. On January 17, 2023, the BAP issued its memorandum affirming the Bankruptcy Court's order disallowing Differential's claims. (See BAP ECF 39-2).

**2. The Chapter 7 Trustee's Adversary Complaint**

The Trustee's claims that he is selling and transferring to Geo-Logic are described in an adversary complaint that he filed against Thomas Seal, Jette Seal, Differential, and others. Please see *Burke vs. Metal Recovery Solutions, Inc., et al.* Adv. No. 21-05066-GS. The adversary complaint contained 11 claims for relief. Those are:

1. Alter Ego – Dr. & Mrs. Seal & Differential Engineering
2. Fraudulent Transfer - §548(a)(1)(A) – Dr. & Mrs. Seal
3. Fraudulent Transfer - §548(a)(1)(B) – Dr. & Mrs. Seal
4. Fraudulent Transfer - §548(a)(1)(B) – Mark Shonnard
5. Preference - §547 – Mark Shonnard
6. Fraudulent Conveyance NRS 112.140 et. Seq. Dr. & Mrs. Seal and Mark Shonnard
7. Breach of Fiduciary Duty – Dr. & Mrs. Seal
8. Contribution and Indemnity – Dr. & Mrs. Seal
9. Extent Nature and Priority of Lien Objection to Differential POC 2-1
10. Extent Nature and Priority of Lien Objection to Differential POC 3-1
11. Recovery under 11 U.S.C. §550.

The factual basis for each of the Trustee's claims is set forth in his adversary complaint, and the Trustee incorporates herein those facts by reference. The adversary complaint was stayed while Geo-Logic litigated its objections to the proofs of claims filed by Differential.

Based upon the Bankruptcy Court's March 31, 2022 order, the secured status of Differential's allegedly secured proofs of claims has been rendered moot since nothing is owed by the Debtor to Differential.

**3. Geo-Logic's Offer**

On February 14, 2023, Geo-Logic submitted to the Trustee an Asset Purchase Agreement Term Sheet (Herein "Purchase Agreement"). A copy of the Purchase Agreement has been attached hereto as Exhibit "2". Payment is due within five business days of the Bankruptcy Court entering a final, non-appealable order approving the attached Purchase Agreement.

A. ASSETS PURCHASED

The Purchase Agreement states that it is for "All assets of the Debtor's bankruptcy estate." The Trustee hereby incorporates this definition of Purchased Assets in Exhibit "2" by reference. This includes tangible and intangible assets, including but not limited to the items specified in the Purchase Agreement. The only exception is the estate's cash on hand. Geo-Logic is not assuming nor purchasing the Debtor's or its bankruptcy estate's liabilities.

The tangible assets include those described in the Lease Agreement. Those include the 4G1 and 4G2 trailers and ancillary equipment/supplies (including without limitation the Crew Trailer, the Chevy Pickup and all spare parts, job computer, and supplies).

The intangible assets are all other claims, rights, credits, causes of action, contracts, leases owned by the Debtor, and those claims that the Chapter 7 Trustee would have the right to bring under Chapter 5 of the Bankruptcy Code, as well as other claims under state or federal law.

B. SALE TERMS

The Purchase Agreement offers to buy all of the Debtor's and its bankruptcy estate's assets and all of the Chapter 7 Trustee's rights and claims for a lump sum payment of $1,150,000.

Since this is a sale conducted pursuant to 11 U.S.C. §363(b) the Chapter 7 Trustee will consider any overbids made by any party at or before the time this matter is heard by the Bankruptcy Court.

C. WARRANTIES AND REPRESENTATIONS

Since the claims that have been brought by the Chapter 7 Trustee in his adversary proceeding and all other claims that may exist are part of the Purchased Assets, Geo-Logic has acknowledged that it has had counsel examine all pending litigation, including relevant pleadings and the docket sheets, and it has been properly advised as to all claims and defenses of all parties transactionally related to said litigation. The estate's sale of the claims, rights, credits, and causes of action are as-is with no guarantees of any kind as to the merits or outcome.

In addition, Geo-Logic is also aware of all deadlines with respect to the pending litigation.

D. THE ORDER APPROVING SALE

Pursuant to page 4 of the Purchase Agreement, the parties have agreed any order approving this sale and compromise will contain the following terms:

1. All Purchased Assets shall be purchased free and clear of all claims, including without limitation successor liability claims, liens, and encumbrances pursuant to §363(b) and (f) of the Bankruptcy Code;
2. Buyer shall have the protections of §363(m) as a good faith purchaser;
3. Assignment of all Agreements is authorized and approved;
4. The 14 day time period in Fed. R. Bankr. P. 6004(h) shall be waived;

5. Within 15 days after entry of the Sale Order on the docket, Buyer and Trustee shall file a notice of substitution of real party in interest in all pending litigation in which Seller is a party, replacing Seller with the Buyer.

6. The Purchased Assets shall remain property of the estate until Buyer has paid the Purchase Price in full. Until such time, all provisions of 11 U.S.C. §362(a) shall remain in full force and effect related to the Purchased Assets as to all persons and entities, whether they are parties to the Purchase Agreement or not. Upon payment of the purchase price, the automatic stay of 11 U.S.C. §362(a) shall terminate as to all assets and all claims, even claims that involve debtor or the estate's nominal designation as a party.

7. The order approving this sale shall apply the injunctive provisions of 11 U.S.C. §105(a).

8. Upon approval of the Purchase Agreement, Trustee shall execute all necessary documents to transfer the Purchased Assets ("Transfer Documents").

**3. Authority**

A. PROTECTION OF THE PURCHASED ASSETS

In addition to having the automatic stay remain in effect as to the Purchase Assets until payment in full, the Trustee is also seeking that the order approving this sale will apply the injunctive provisions of 11 U.S.C. §105(a).

Section 105(a) provides that the bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." This provision has been interpreted by at least one court to permit a bankruptcy judge to order a sale of assets free and clear of all claims, not merely the "interests" specified in §363(f). *Bronson v. Conseco Fin. Servicing Corp.*, CIVS031611DFLPAN, 2005 WL 8176584, at *2 (E.D. Cal. Mar. 29, 2005), citing *In re White Motor Credit Corp.*, 75 B.R. 944, 948-49 (Bankr. N.D. Ohio 1987).

It is also recognized that a bankruptcy court has the power to issue a sale order that blocks successor liability claims, at least claims arising from injuries that exist at the time of the order. *Wilkins v. Rymes Heating Oils, Inc.*, 360 F. Supp. 3d 57, 62–63 (D.N.H. 2019)

B. <u>OVERBIDS</u>

At or before the hearing of this matter any party shall be free to make an overbid with respect to the sale of these assets. The guiding principle is that the court's obligation in section 363(b) sales is to assure that optimal value is realized by the estate under the circumstances. *In re Golden Empire Air Rescue, Inc.,* EC-07-1086, 2007 WL 7540946, at *7 (B.A.P. 9th Cir. Oct. 25, 2007).

A trustee's fiduciary duty to maximize the value of the assets of the estate trumps any contractual obligation that a trustee arguably may incur in the course of making an agreement that is not enforceable unless and until it is approved by the court. For this reason, overbids must be allowed if it is in the best interests of the estate. *In re Mickey Thompson Entm't Group, Inc.*, 292 B.R. 415, 421 (B.A.P. 9th Cir. 2003).

C. <u>THE SALE IS PROPER UNDER §363(B)</u>

This is a sale of assets not in the ordinary course of business. 11 U.S.C. §363(b)(1) provides in relevant part:

> The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, except that if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless-- . . .

The court's obligation in a sale under §363(b) is to assure that optimal value is realized by the estate under the circumstances. The requirement of a notice and hearing operates to provide both a means of objecting and a method for attracting interest by potential purchasers. Ordinarily, the position of the trustee is afforded deference, particularly where the trustee's business judgment is entailed in the analysis or where there is no objection. *In re Lahijani,* supra.

In the case at bar, the Trustee has investigated the value of these Purchased Assets and has had confidential settlement and sale discussions with multiple parties, including Geo-Logic. The $1,150,000 that Geo-Logic is offering is greater than any other offer made by any other party, and it is to be paid in a lump sum within five business days of the entry of a final non-appealable order.

The Trustee has taken the steps to insure that all provisions of the automatic stay contained in 11 U.S.C. §362(a) and the injunctive powers under 11 U.S.C. §105(a) remain in effect to protect the Purchased Assets from all parties and entities until the purchase price has been paid in full. Based upon these facts, it is in the Trustee's well-reasoned business judgment that this is the maximum value that can be received for the Purchased Assets.

D. COMPROMISE OF THE CLAIMS IS PROPER

In this case, the Purchased Assets being sold include one claim adverse to the buyer, Geo-Logic: The pending appeal, *Geo-Logic Associates, Inc. v. Metal Recovery Solutions, Inc,* No. 20-15157 (9th Cir.). The sale will in effect resolve the appeal and Debtor's claims and defenses in that underlying litigation. In the sale of claims to the adverse party (as opposed to a mutual resolution of competing claims), the Court must apply both the §363 sale analysis and the factors required for approval of a compromise under Fed. R. Bank. Proc. 9019. *Spark Factor Design, Inc. v. Hjelmeset (In re Open Medicine Inst., Inc.)*, 639 B.R. 169, 182 (B.A.P. 9th Cir. 2022) ("a one-way sale requiring scrutiny under § 363"); see also *In re Lahijani*, 325 B.R. 282, 284 (B.A.P. 9th Cir. 2005).

Federal Rule of Bankruptcy Procedure 9019 governs compromises of settlement in bankruptcy. It provides, in pertinent part:

> (a) Compromise. On motion by the trustee and after a hearing on notice to creditors, the debtor and indentured trustee as provided in Rule 2002(a) and to such other entities as the court may designate, the court may approve a compromise or settlement.
>
> Fed.R.Bankr.P. 9019(a).

Generally, compromises are favored in bankruptcy. See, 9 *Collier on Bankruptcy*, ¶ 9019.03[1] (15th ed. 1990). The law favors compromise and not litigation for its own sake, *In*

*re Blair*, 538 F.2d 849, 851 (9th Cir. 1976), and as long as the bankruptcy court amply considers the various factors that determined the reasonableness of the compromise, the court's decision must be affirmed. *Matter of Walsh Constr., Inc.*, 669 F.2d 1325, 1328 (9th Cir. 1982).

Thus, the court must consider whether the settlement is reasonable given the particular circumstances of the case. *In re A & C Properties*, 784 F.2d 1377, 1380-81 (9th Cir. 1986). In the Ninth Circuit, the fair and equitable settlement standard requires consideration of:

1. The probability of success in the litigation;
2. The difficulties, if any, to be encountered in the matter of collection;
3. The complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it;
4. The interest of the creditors and a proper deference to their reasonable views in the premises, which is considered paramount.

*Id.*, quoted with approval in *In re Woodson*, 839 F.2d 610, 620 (9th Cir.1988). The Court need not conduct a mini trial, but should canvass the issues in order to determine that the settlement meets the standards set forth in *A & C Properties*. *In re Schmitt*, 215 B.R. 417, 423 (B.A.P. 9th Cir 1997). When assessing a compromise, courts need not rule upon disputed facts and questions of law, but rather only canvass the issues. Otherwise, there would be no point in reaching a settlement, and the parties may as well try the case. *In re HyLoft*, 451 B.R. 104, 109 (Bankr. D. Nev. 2011).

Probability of Success

The Trustee has reviewed the appellate briefs in the Ninth Circuit appeal, as well as the record in the underlying litigation. The appeal seeks to overturn a judgment entered in confirming an arbitration award entered after a multi-day evidentiary hearing conducted by the Hon. Philip M. Pro. (ret.). The District Court also denied debtor's pre-petition motion for reconsideration of the order confirming the arbitration award. The matter is fully briefed at the Ninth Circuit and initially set for oral argument, but the appellate court vacated the oral argument hearing date due to the Debtor's bankruptcy.

In the Trustee's opinion, under these circumstances of the confirmed arbitration award, and his review of the record and briefing, there is a very small chance that the Debtor's bankruptcy estate would prevail in in the appeal. The Trustee himself is an experienced appellate attorney. Among other matters, he obtained a writ of certioria in *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61 (2011), and persuaded the circuit en banc to overrule its prior position, *America's Servicing Co. v. Schwartz-Tallard (In re Schwartz-Tallard)*, 803 F.3d 1095 (9th Cir. 2015). The Trustee's decision to settle the appeal with this sale of the Purchased Assets to Geo-Logic falls squarely within his well-reasoned business judgment and is in the best interest of the creditors in this bankruptcy case, and is a better option for the bankruptcy estate and its creditors than incurring additional administrative expenses with little probability of success on the appeal.

Difficulties in Collection

This factor also supports the compromise. As part of the appeal, the Debtor has asserted that not only should the judgment and award be set aside, but that the Debtor should be allowed to pursue a claim against Geo-Logic. Not only does the Trustee believe there is little likelihood of a successful appeal with a reversal and remand, but also, he viewed the chances as even smaller that the unlikely remand would include a resumption of the arbitration with the Debtor's prosecution of a claim against Geo-Logic. While it is true that Geo-Logic has shown the resources to contest this bankruptcy, it also will have the resources to challenge any arbitration. The Debtor's proposition is not a simple one, either in likelihood or prosecution, let alone collection.

Complexity of Litigation

The complexity of the litigation also favors a compromised resolution. The disputes between the Debtor and Geo-Logic go back for years, and the Trustee already has deferred to Geo-Logic on the intricacies of the transaction in objecting to Differential Engineering's related claims. The Trustee and the Debtor's bankruptcy estate are not in a position, financially or

factually, to learn all the facts, particularly when Geo-Logic already has shown a mastery of the facts and a willingness and financial ability to litigate the facts to judgment.

The interest of the creditors

This settlement, including resolution of the Ninth Circuit appeal, brings this bankruptcy case to an end for the benefit of the creditors, with the exception of administrative matters involving the Trustee's final account and report, distributions to creditors, and formal closure of the bankruptcy case. The two other creditors in this case — both law firms that previously represented the Debtor — will see a prompt payment of their claims virtually, if not totally, in full from Geo-Logic's payment in full for the Purchased Assets.

In conclusion, based on the foregoing, any reply that the Trustee might file, and the arguments and evidence to be received by the Court at a hearing on this Motion, the Trustee respectfully requests that this Motion be approved according to the terms herein and the Purchase Agreement.

Dated: This 23 day of February, 2023

By: ______________________________
Michael Lehners, Esq.
429 Marsh Ave.
Reno, Nevada 89509
Nevada Bar Number 003331

**Exhibit List**

| | |
|---|---|
| Exhibit 1 | July 31, 2019 Lease Agreement |
| Exhibit 2 | Asset Purchase Agreement and Term Sheet |

# Exhibit 1

Exhibit 1

# LEASE WITH PURCHASE OPTION AGREEMENT

This LEASE WITH PURCHASE OPTION AGREEMENT (this "Agreement") is entered into effective as of the 31st day of July 2019 (the "Effective Date") by and between Metal Recovery Solutions ("LESSOR"), a Nevada corporation owned by Thom and Jette Seal, and Jex Technologies Corporation, a Nevada corporation (hereinafter "LESSEE"). LESSOR and LESSEE may each be individually referred to herein as a "Party" and collectively as the "Parties."

WHEREAS, the LESSOR is the owner of certain Equipment described in Section 1 of this Agreement; and

WHEREAS, LESSEE desires to lease the Equipment from the LESSOR and the LESSOR agrees to lease the Equipment to LESSEE under the terms and conditions set forth in this Agreement.

NOW THEREFORE, in consideration of the foregoing and the mutual covenants contained in this Agreement, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. Equipment. The LESSOR hereby leases to LESSEE and LESSEE hereby leases from LESSOR that certain equipment (the "Equipment"), as fully described in Exhibit A, attached hereto and incorporated herein by reference. The Equipment is collateralized to a note owing from LESSOR to Differential Engineering, a Nevada corporation.

2. Term. This Agreement shall commence on the Effective Date and shall be for a period of ten (10) years or until the earlier exercise of the purchase option described below (the "Purchase Option"), unless otherwise terminated by the Parties hereto in accordance with a written agreement executed by each Party (the "Term").

3. Rental Payment. As rent for the Equipment, LESSEE shall pay to LESSOR, the rental payments set forth per the payment schedule (the "Payment Schedule") set forth in Exhibit B, attached hereto and incorporated herein by reference. The first rental payment shall become due and payable as of thirty (30) days from the Effective Date. Rental payments shall be made to the LESSOR at the address set forth herein or such other address as the LESSOR requests in writing.

4. Bond. To secure performance of LESSEE's obligations under this Agreement, and in lieu of any security deposit, LESSEE shall obtain a bond or other reasonable form of security or surety in favor of the LESSOR in the sum of three hundred thirty-three thousand and no/100 Dollars ($333,000) to guarantee of the return of the Equipment in the same condition as originally existing at the time of execution of this Agreement and the payment of the License Amounts due and payable under Section 4 (a) (1) and (2) of the TLA until the return of the Equipment Upon the return of the Equipment to the LESSOR in good working order, without damage, ordinary wear and tear excepted, or upon the exercise of the purchase option ("Purchase Option") described below, the LESSOR shall

release the bond back to the LESSEE. LESSOR shall use proceeds from the bond to make reasonable repairs to bring the Equipment back to its original condition, ordinary wear and tear excepted, and any remaining amount from the bond shall be returned to LESSEE.

5. Taxes. LESSEE shall pay all sales, use, excise, personal property or other taxes (excepting state and federal income taxes and other taxes upon the "net income" of the LESSOR) that may be imposed on either Party as a result of this transaction. LESSEE shall indemnify, defend and hold the LESSOR, its regents, employees, and agents harmless from all liabilities, suits, judgments, obligations, fines, penalties, claims, costs, and expenses (including reasonable attorneys' fees) arising out of the imposition of, or attempt to impose, any such tax on the LESSOR.

6. Maintenance. Throughout the Term, LESSEE shall provide for the service, repair and maintenance of the Equipment, at LESSEE's sole expense, so as to keep the Equipment in as good condition, repair, appearance and working order as when delivered to LESSEE hereunder, ordinary wear and tear excepted. LESSEE shall, at LESSEE's sole expense, replace any and all parts and devices which may from time to time become worn out, lost, stolen, destroyed, damaged beyond repair, or rendered unfit for use for any reason whatsoever. All such replacement parts, mechanisms, and devices shall be free and clear of liens, encumbrances, and rights of others and shall become the property of the LESSOR and shall be covered by this Agreement to the same extent as the Equipment originally covered by this Agreement.

7. Use of Equipment. LESSEE shall exercise due care in its operation, use and maintenance of the Equipment. LESSEE shall not use, and shall not permit others to use, the Equipment in any manner that would contravene applicable laws, rules, regulations and other governmental directives, would violate the terms of any manufacturer's or like warranty, or would contravene the manufacturer's reasonable operational standards for the Equipment. If the LESSOR notifies LESSEE of any additional operational standards, LESSEE shall adhere, and shall cause others using the Equipment under this Agreement to adhere, to such standards in the operation of the Equipment. LESSEE shall not alter or modify the Equipment without the prior written consent of the LESSOR. LESSEE agrees that only qualified personnel shall operate and maintain the Equipment.

8. Permits. LESSEE shall obtain all permits and licenses necessary for the installation, operation, possession and use of the Equipment. LESSEE shall comply with all laws, rules, regulations and other governmental directives applicable to the installation, use, and operation of the Equipment and, if compliance with such law, rule, regulation or other governmental directive requires changes or additions to be made to the Equipment, such changes or additions shall be made by LESSEE at LESSEE's sole cost and expense upon the LESSOR's written approval of the same.

9. Utility Charges. LESSEE shall pay all charges for fuel. gas, water, steam, electricity, light, heat, power, telephone or other utility service to be used on or in connection with the Equipment, including charges for installation of such services. There shall be no abatement or diminution of rent

due to the interruption of any such services.

10. Default; Remedies. In the event that, during the Term of this Agreement, LESSOR believes that LESSEE is in default of this Agreement, LESSOR may send LESSEE a written notice upon the occurrence of any of the following events: (a) any material breach by LESSEE of this Agreement (other than an obligation to make lease payments under this Agreement) which has not been cured within thirty (30) days of written notice given to LESSEE by LESSOR, or which LESSEE has not commenced a cure within thirty (30) days of such notice and continues thereafter to diligently effectuate a cure within a reasonable time, in the event such cure reasonably requires in excess of thirty (30) days to accomplish; or, in the event of a good faith dispute of the occurrence of a material breach, LESSEE notifies Owner of such dispute within thirty (30) days of Owner's notice and the parties thereafter work in good faith to resolve the matter, which may involve submitting the matter to arbitration in which the LESSEE will pay/reimburse all legal costs of LESSOR; provided however, that in the event that the original LESSOR transfers its interest in this Agreement to a third party, the losing party in any such arbitration occurring thereafter shall pay all attorney's fees of both parties incurred in any such arbitration; or (b) if LESSEE ceases to do business in the ordinary course or becomes insolvent. Upon the sending of such notice under (a) or (b), upon such termination, the License shall terminate as provided in Section 11 below. In the event of a failure to pay lease payments as provided under this Agreement, LESSOR shall have the right to send a written notice of default to LESSEE calling for the termination of this Agreement in the event that, following the passage of a thirty-day grace period following the receipt of such notice by LESSEE with such payment remaining unpaid, the provisions of Section 11 below will apply. .

11. Termination. This Agreement may be terminated by both parties upon their mutual agreement at any time during the Term hereof. LESSOR may terminate this Agreement by notice to LESSEE under the conditions described in Section 10 above. In the event of termination for a breach as in Section 10(a) or (b) above, the Equipment will be transferred back to LESSOR within sixty (60) days, providing for LESSEE to make arrangements to replace the Equipment. In the event that termination is as a result of non-payment following the grace period described in Section 10, LESSEE and/or its affiliates will automatically transfer back all ownership of the Equipment to LESSOR. In addition to the above, and provided LESSEE is not in default, LESSEE may terminate this Agreement at any time upon ninety (90) days' written notice to LESSOR. In addition, this Agreement and the obligation to make payments under the Agreement terminate at the time at which the accumulated payments hereunder equal $1,000,000, at which time the title to the ownership of Equipment shall be transferred to LESSEE under the forms of conveyance as described in Exhibit C.

12. Return of Equipment. Upon termination of this Agreement (except for termination by reason of completing the payments for the purchase of $1,000,000), LESSEE, at is sole cost and expense, shall within a reasonable time deliver the Equipment to the LESSOR at the LESSOR's address set forth below. The return of the Equipment shall be made in such a manner that the Equipment is in

fully operational condition (bond returned upon return of Equipment in fully operational condition and all license fee until equipment is returned, repaired and becomes operational. Costs and license fees will be subtracted from bond amount).

13. Insurance. LESSEE hereby acknowledges and agrees that its assumption of loss of the Equipment shall attach upon the earlier of (i) LESSEE's receipt of the Equipment, or (ii) upon the LESSOR's delivery of the Equipment to a common carrier for transporting to LESSEE (the "Equipment Acceptance Date"). LESSEE shall, at its sole expense, obtain and maintain throughout the Term general commercial shipping insurance for damage and loss during shipping of equipment, commercial fire, theft and flood insurance on the equipment, commercial liability insurance against claims for bodily injury, death and property damage with limits of not less than One Million Dollars ($1,000,000) per occurrence and Three Million Dollars ($3,000,000) general aggregate, to cover such liability caused by, or arising out of activities of the LESSEE and/or LESSEE's employees with respect to the Equipment. All such certificates evidencing such insurance shall name the LESSOR as an additional insured. LESSEE represents that it has workers' compensation insurance to the extent required by law. LESSEE agrees to furnish proof of all such insurance to the LESSOR upon request.

14. Damage. LESSEE shall be responsible for any loss of or damage to the Equipment from any cause at all, whether or not insured, from the Equipment Acceptance Date. If the Equipment is lost, stolen or damaged, LESSEE will promptly notify the LESSOR of such event. In no event shall such loss or damage relieve LESSEE of its obligations under this Agreement. In the event of such loss or damage, LESSEE, at its option, shall: (i) promptly repair the Equipment to return it to good working order; or (ii) replace the Equipment with like Equipment of the same or later model (upon the LESSOR's written approval), in good condition and working order, free and clear of all liens and encumbrances and grant the LESSOR the right to perfect its security interest in the replacement Equipment and such replacement shall be substituted in this Agreement by appropriate amendment; or (iii) pay the LESSOR the balance of the purchase price under the Purchase Option, less any rental payments previously paid.

15. Indemnification. LESSEE shall indemnify, defend and hold the LESSOR harmless from all losses, liabilities, actions, suits, judgments, obligations, fines, penalties, claims, costs and expenses (including reasonable attorneys' fees and investigative fees) arising out of the rental of the Equipment and all acts and omissions related thereto.

16. Security Interests in the Equipment. In no event shall LESSEE assert any ownership interest in or to the Equipment. LESSEE shall not grant or permit any person or business entity to assert a security or other interest in the Equipment. At all times during the Term, LESSEE shall ensure that the Equipment is identified as being owned by the LESSOR.

17. Disclaimer of Warranties: Personal Property. The LESSOR disclaims and excludes all warranties, express and implied, including, but not limited to, the implied warranties of merchantability

and fitness for a particular purpose, concerning the Equipment leased under this Agreement. The Parties acknowledge and agree the Equipment shall be leased and accepted "AS IS" with all defects. The Equipment is and shall at all times be and remain personal property, notwithstanding that the Equipment, or any part thereof, may now be or hereafter become in any manner affixed or attached to or embedded in or permanently rested upon real property or any building thereon or attached in any manner to what is permanent by any means of cement, plaster, nails, bolts, screws or otherwise.

18. Purchase Option. The LESSEE shall at all times, provided it is not in default under this Agreement, have and maintain the option to purchase the Equipment (the "Purchase Option") for a total purchase price of $1,000,000, less any lease payments that have been made under this Agreement as of the time of the exercise of such Purchase Option. The Purchase Option may be exercised at any time by the LESSEE during the term of this Agreement upon written notice to LESSOR by LESSEE of its intent to exercise the Purchase Option and by paying to LESSOR any remaining amount of the purchase price not previously paid to LESSOR in the form of lease payments under this Agreement, in the same manner to LESSOR as such lease payments are made, and within thirty (30) days of such notice. Upon receipt of such purchase price, LESSOR shall, within thirty (30) days, convey the Equipment to LESSEE by executing and delivering to LESSEE the forms of conveyance as described in Exhibit C attached hereto.

19. Right Of First Refusal (**ROFR**) On The Sale Of Any Interest In The Equipment. In the event that LESSOR or any owner (being an owner by reason of the previous purchase as provided for under this Section 19) of all or any portion of the Equipment, at any time or from time to time, desires to sell some or all of such interest in the Equipment, LESSEE or its assigns shall have the right of first refusal to purchase such portion of the Equipment under the following terms and conditions :

(a) If LESSOR or any other such owner receives a *bona fide* written offer (a "**Third Party Offer**") from any person dealing at arm's length with LESSOR or any such other owner to purchase all or a portion of the Equipment (the "**Offered Interest**"), which LESSOR or such other owner (hereinafter the "**Offeree**") either wishes to accept or has accepted conditional on and subject to this right of first refusal, the Offeree shall promptly give notice of the Third Party Offer (the "**Notice of Offer**") to the LESSEE and comply with this Section 19. The Notice of Offer must contain a copy of the Third Party Offer, disclose the identity of the person making the Third Party Offer (the "**Third Party Offeror**") and provide evidence sufficient to establish that the Third Party Offeror has the power and capacity, including the financial capacity, to complete the purchase of the Offered Interest. If the Third-Party Offer provides for any non-cash consideration to be paid to the Offeree in respect of the Offered Interest, the Notice of Offer must specify the Offeree's independent, good faith estimate of the cash equivalent value of such non-cash consideration. If the Offered Interest is being offered for sale to the Third Party Offeror together with or in conjunction with other unrelated assets of the Offeree, the LESSEE will in accordance with Section 19(b) be entitled to purchase only the Offered Interest and the Notice of Offer must specify the Offeree's independent, good faith estimate of the cash equivalent value being offered by the Third Party Offeror for the Offered Interest. If the LESSEE does not agree with any one or more of the foregoing estimates, as

applicable, such disagreement, if not resolved, will constitute a dispute which may be submitted directly to arbitration by either the Offeree or the LESSEE for final determination, in which case the periods referred to in this Section 19 shall be extended by the time taken to obtain such final determination. Each party will pay for its own attorney's fees in such a dispute. Upon the Notice of Offer being given, the LESSEE will have the right to purchase all, but not less than all, of the Offered Interest at the same price and upon the same terms and conditions as are contained in the Third Party Offer, less the amounts that LESSEE has previously paid under this Agreement toward the purchase of such interest, but in no event less than ninety (90) days from the later to occur of the receipt of the Third Party Offer or the final determination under arbitration, subject to paying the aforesaid cash equivalent in lieu of any non-cash consideration (the "**ROFR Consideration**").

(b) If the LESSEE desires to exercise its right to purchase all of the Offered Interest as contemplated by Section 19(a), it will give notice of such desire (the "**ROFR Exercise Notice**") to the Offeree within 30 Business Days of having been given the Notice of Offer. The giving of the ROFR Exercise Notice shall constitute a legally binding agreement between the LESSEE and the Offeree for the sale by the Offeree to the LESSEE of the Offered Interest in accordance with the terms set out in the Third Party Offer (subject to the LESSEE paying the ROFR Consideration in lieu of any non-cash consideration) which sale transaction will be completed on the date therein provided, but in no event less than ninety (90) days as provided above (or on such other date as the LESSEE and the Offeree shall agree) by delivery of the Offered Interest by the Offeree to the LESSEE with good title, free and clear of all Encumbrances arising on or after the date the Offeree received such Third Party Offer and in accordance with the forms of conveyance as described in Exhibit C attached hereto, against payment by the LESSEE to the Offeree of the ROFR Consideration by bank wire transfer, certified cheque or bank draft. If, at the time of completion, any portion of the Offered Interest is subject to any Encumbrance, the LESSEE will be entitled to deduct from the purchase money to be paid to the Offeree the amount required to discharge such Encumbrance and will apply such amount to discharge such Encumbrance, on behalf of the Offeree.

(c) If the LESSEE does not give the ROFR Exercise Notice in accordance with the provisions of Section 19(b), the right of the LESSEE to purchase the Offered Interest will terminate and the Offeree may sell all, but not less than all, of the Offered Interest to the Third Party Offeror in accordance with the terms of the Third Party Offer at any time within 60 Business Days after the expiry of the 30 Business Day period specified in Section 19(b); provided, however, such Third Party Offeror's interest shall remain subject to the LESSEE's rights under this Section 19 with respect to the interest so purchased by the Third Party Offeror in the event at any time subsequent thereto, as long as this Agreement remains in force, such Third Party Offeror desires to sell all or a portion of the interest so purchased. If the Offered Interest is not so sold within such 60 Business Day period on such terms, the rights of the parties pursuant to this Section 19 will again take effect with respect thereto.

Notwithstanding any purchase of some or all of the Equipment (each a "transaction"), such transaction and such interest acquired by a third party shall remain subject to the rights of LESSEE

under this Agreement with respect to the rights of first refusal of LESSEE respecting any subsequent purchase of any interest in the Equipment.

20. General Provisions.

20.1 Entire Agreement; Amendment. This Agreement is intended by the Parties as the final and binding expression of their agreement and as the complete and exclusive statement of its terms. These Agreements cancel, supersede and revoke all prior negotiations, representations and agreements between the Parties, whether written or oral, relating to the subject matter of these Agreements. This Agreement may be amended only in writing duly executed by all Parties.

20.2 Assignment. This Agreement may not be assigned by a Party without the prior written consent of the other Party. Any assignment attempted to be made in violation of this Agreement shall be void. In the event of any assignment, LESSEE shall remain responsible for its performance and liable for assignee's performance.

20.3 Force Majeure. No Party to this Agreement shall be responsible for any delays or failure to perform any obligation under this Agreement due to acts of God, strikes or other disturbances, including, without limitation, war, insurrection, embargoes, governmental restrictions, acts of governments or governmental authorities, and any other cause beyond the control of such party. During an event of force majeure, the Parties' duty to perform obligations shall be suspended.

20.4 Governing Law; Consent to Jurisdiction. The internal laws of the state of Nevada shall govern the validity, construction and enforceability of this Agreement, without giving effect to its conflict of laws principles. All suits, actions, claims and causes of action relating to the construction, validity, performance and enforcement of this Agreement shall be in the courts of Reno, Nevada.

20.5 Independent Contractor. In the performance of their obligations under this Agreement, the Parties shall be independent contractors, and shall have no other legal relationship, including, without limitation, joint ventures, or employees. Neither Party shall have the right or power to bind the other Party and any attempt to enter into an agreement in violation of this section shall be void.

20.6 Notices. All notices, requests and other communication that a Party is required or elects to deliver shall be in writing and shall be delivered personally, or by facsimile (provided such delivery is confirmed), or by a recognized overnight courier service or by United States mail, first-class, certified or registered, postage prepaid, return receipt

requests, to the other Party at its address set forth below:

If to LESSOR: Metals Recovery Solutions, PO Box 13014, Reno, Nevada 89507
Attn: Dr. Thom Seal

If to LESSEE: JEX Technologies Corporation, 445 Apple Street, Suite 107, Reno, Nevada 89502

20.7 Severability. If one or more provisions of this Agreement, or the application of any provision to any Party or circumstance, is held invalid, unenforceable, or illegal in any respect, the remainder of this Agreement and the application of the provision to other Parties or circumstances shall remain valid and in full force and effect.

20.8 Non-Waiver of Defaults. Any failure of the LESSOR at any time, or from time to time, to enforce or require the strict keeping and performance of any of the terms and conditions of this Agreement, or to exercise a right hereunder, shall not constitute a waiver of such terms, conditions or rights, and shall not affect or impair the same, or the right of the LESSOR to avail itself same.

20.9 Section Headings. All section headings are for convenience of reference only and are not intended to define or limit the scope of any provision of this Agreement.

20.10 Execution. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all together shall constitute but one and the same Agreement.

IN WITNESS WHEREOF, the Parties have entered into this Agreement, effective as of the Effective Date set forth above.

MINERAL RECOVERY SOLUTIONS, Inc.
PO Box 13014
Reno, NV 89507

LESSOR

By: Thom Seal
Name: Thom Seal, PhD, PE, QP, CEO
Title: CEO, President.

JEX TECHNOLOGIES CORPORATION
445 Apple St., Suite 107
Reno, NV 89502

LESSEE

By: [signature]
Name: David McMullin
Title: CEO and Director, JEX Technologies Corporation

# EXHIBIT A

## EQUIPMENT

The 2 trailers currently owned by LESSOR (4G1 and 4G2) and ancillary equipment/supplies (the Crew Trailer, the Chevy Pickup and all spare parts, job computer and supplies)

EXHIBIT B

PAYMENT SCHEDULE

For the 2 trailers currently owned by LESSOR (4G1 and 4G2) and ancillary equipment/supplies (the Crew Trailer, the Chevy Pickup and all spare parts, job computer and supplies), the lease payments shall be a minimum of $6,700 per month, increased to $16,700 per month for any month in which both trailers are working at a client's mine or mines.

All payments under this Agreement terminate at any time at which the accumulated payments hereunder equal $1,000,000, at which time the title to the 2 trailers and all above-described equipment/supplies shall be transferred to LESSEE as further provided in the Agreement.

# EXHIBIT C

## FORMS OF CONVEYANCE

The form of conveyance shall be standard Bill of Sale format with Warranty of No Encumbrances as is common in the jurisdiction where the Equipment or portion thereof is located at the time of the conveyance

# Exhibit 2

Exhibit 2

# ASSET PURCHASE AGREEMENT TERM SHEET

This term sheet (the "Term Sheet") summarizes certain material terms of the proposed Asset Purchase Agreement (the "Agreement") to be entered into between (i) Metal Recovery Solutions, Inc. (the "Debtor") and Christopher Burke, solely in his capacity as the Chapter 7 trustee of Metal Recovery Solutions, Inc. (collectively, "Sellers"), pending in Case Number 20-50660-gs in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court") and (ii) Geo-Logic Associates, Inc. (the "Buyer").

| | |
|---|---|
| *Purchase Price* | $1,150,000 in cash to be paid as follows:<br>• $1,150,000 (the "Payment") within five business days of the Bankruptcy Court entering a final, non-appealable order approving the Agreement (the "Order").<br>○ |
| *Purchased Assets/Excluded Assets* | Purchased Assets shall include the following without limitation (the "Purchased Assets"):<br>(i) All assets of the Debtor's bankruptcy estate ("Estate"), including without limitation:<br>a. the 4G1 and 4G2 trailers and anciliary equipment/supplies (including without limitation the Crew Trailer, the Chevy Pickup and all spare parts, job computer and supplies) as detailed in the *Lease with Purchase Option Agreement* dated July 31, 2019 by and between JEX Technologies Corporation ("JEX") and the Debtor (the "Lease");<br>b. all of the Sellers' claims, counterclaims, rights, demands, credits, suits, actions, causes of action and claims for relief (including any commercial tort claims), defenses, rights of set-off, proceedings, orders, judgments, appeals, injunctions, writs, awards, and rulings, of any type, whether contingent or noncontingent, liquidated or unliquidated, matured or unmatured, known or unknown, suspected or unsuspected (collectively, "Claims for Relief"), and any proceeds of, or property and interests recovered in respect of, and the right to control, all Claims for Relief of any Seller, including, without limitation, all Claims for Relief pursuant to chapter 5 of the Bankruptcy Code or similar state laws, including, but not limited to, |

| | |
|---|---|
| | against current or former insiders of the Sellers, current or former equity owners of the Sellers, current and former lenders to the Sellers, and current or former directors or officers of the Sellers, and all causes of action or alter ego claims the Sellers have brought or could bring against Differential Engineering, Inc., JEX, Dr. Thomas Seal, Jette Seal, Mark Shonnard, or any other third-party;<br><br>c. For the avoidance of doubt, Claims for Relief include all asserted and unasserted claims and defenses owned by Sellers or the Estate, including, but not limited to, those in: (i) *Burke v. Metal Recovery Solutions, Inc.*, Adv. No. 21-05066 (Bankr. D. Nev.); (ii) *Geo-Logic Associates, Inc. v. Metal Recovery Solutions, Inc.*, Case No. 3:17-cv-00563-MMD-WCG (D. Nev.), on appeal as Case No. 20-15157 (9th Cir.); (iii) *Geo-Logic Associates, Inc. v. Metal Recovery Solutions, Inc.*, Case No. 3:20-cv-00180-MMD-CSD (D. Nev.); and (iv) any and all other claims and defenses that Sellers or the Estate can bring against any individual or entity, whether known or unknown to date.<br><br>d. all contracts, leases, agreements, work orders, licenses, amendments, and rights thereunder between the Debtor and any third-party, including, without limitation, all non-circumvention, non-disclosure, confidentiality, collaboration, and consulting agreements (collectively, the "Agreements"), regardless of whether such Agreements are executory, have been rejected or deemed rejected within the meaning of Bankruptcy Code Section 365.<br><br>e. all intellectual property and other intangible property rights, including, but not limited to, intellectual property licenses, and all goodwill associated with such intellectual property, including, without limitation, the right to sue and recover damages for past, present, and future infringements thereof ("Intellectual Property"). |
| ***Assumed Liabilities/Excluded Liabilities*** | Buyer will not assume any liabilities of the Sellers or the Estate. |
| ***Warranties and Representations*** | • Buyer acknowledges that some or all of the Claims for Relief are the subject of pending litigation, including (i) *Burke vs.* |

| | |
|---|---|
| | *Metal Recovery Solutions, Inc. et. al.* Adv. No. 21-05066-GS (Bankr. D. Nev.); (ii) *Differential Engineering vs. Geo Logic Associates and Christopher P. Burke, Chapter 7 Trustee*, BAP No. NV 22-1081; (iii) *Geo-Logic Associates, Inc. vs. Metal Recovery Solutions*, Case No. 3:17-cv-00563-MMD-WCG (D. Nev.), on appeal as Case No. 20-15157 (9th Cir.); and (iv) *Geo-Logic Associates, Inc. v. Metal Recovery Solutions, Inc., et al.*, Case No. 3:20-cv-00180-MMD-CSD (D. Nev.).<br>• Buyer has had counsel examine all pending litigation, including relevant pleadings and the docket sheets, and it has been properly advised as to all claims and defenses of all parties transactionally related to said litigation.<br>• Buyer is also aware of all deadlines with respect to the pending litigation.<br>• The Estate's sale of the Claims for Relief is as is with no guarantees of any kind as to the merits or outcome. However, Sellers understand that included in the Purchased Assets are all alter ego claims held by the Estate and that these claims, including those brought by Geo-Logic Associates, Inc. in Case No. 3:20-cv-00180-MMD-CSD in the United States District Court, District of Nevada (Reno), are general claims and property of the Estate that, upon payment in full, shall be transferred to Buyer.<br>• Sellers acknowledge and agree that any rights, title, and/or interest the Estate holds in any license to technology, including, but not limited to, patents relating to heap leach processing, upon payment in full, shall be transferred to Buyer.<br>• Sellers understand that the Agreements to be assigned are non-executory contracts and not subject to Bankruptcy Code Section 365; provided, however, to the extent any of the Agreements are executory, Sellers shall assume and assign the Agreement to Buyer. |
| ***Default*** | •<br>• In the event of a default, each party shall pay its own costs relating to this Term Sheet. |
| ***Sale Order*** | The Sale Order, which shall be in form and substance reasonably acceptable to the Buyer, shall include without limitation the following: |

| | |
|---|---|
| | • All Purchased Assets shall be purchased free and clear of all claims, including without limitation successor liability claims, liens, and encumbrances pursuant to § 363(b) and (f) of the Bankruptcy Code;<br>• Buyer shall have the protections of § 363(m) as a good faith purchaser;<br>• Assignment of all Agreements is authorized and approved;<br>• The 14 day time period in Fed. R. Bankr. P. 6004(h) shall be waived; and<br>• Within 15 days after entry of the Sale Order on the docket, Buyer and Sellers shall file a notice of substitution of real party in interest in all pending litigation in which either of Sellers is a party, replacing Sellers with the Buyer.<br>• The Purchased Assets shall remain property of the Estate until Buyer has paid the Purchase Price in full. Until such time, all provisions of 11 U.S.C. § 362(a) shall remain in full force and effect related to the Purchased Assets as to all persons and entities, whether they are parties to this agreement or not.<br>• Upon approval of this Term Sheet and entry into the definitive documents. Sellers shall execute all necessary documents to transfer the Purchased Assets ("Transfer Documents"). Sellers will hold the Transfer Documents in escrow, and within five business days of payment in full of the Purchase Price, Sellers shall mail the Transfer Documents via certified, first-class mail to Buyer and file a notice with the Bankruptcy Court confirming payment in full of the Purchase Price and the Sale has closed, thus terminating the automatic stay as to the Purchased Assets and transferring all rights, title, and interest in the Purchased Assets to Buyer.<br>• |
| *Court Approval* | • This Term Sheet and the Agreement are subject to approval by the Bankruptcy Court;<br>• The Trustee will file a motion to approve this Sale pursuant to Section 363(b) and (f) of the Bankruptcy Code in form and substance reasonably acceptable to Buyer. Such motion shall |

| | |
|---|---|
| | be noticed to the official mailing matrix and all other parties entitled to notice of the motion. |