ROBERT T. STEWART (SB #13770)
rtstewart@foley.com
ELLEN E. OSTROW (*admitted pro hac vice*)
eostrow@foley.com
FOLEY & LARDNER LLP
95 S. State Street, Suite 2500
Salt Lake City, UT 84111
Telephone: 801.401.8952

*Attorneys for JEX Technologies Corp.*

UNITED STATES BANRUPTCY COURT

DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>METAL RECOVERY SOLUTIONS, INC.,<br>aka MRS, INC.,<br><br>Debtor. | Case No. 20-50660-gs<br>Chapter 7<br><br>DECLARATION OF DAVID MCMULLIN OF JEX TECHNOLOGIES, INC. IN SUPPORT OF 11 U.S.C § 363(m) FINDINGS<br><br>Hearing Date: 4/17/2023<br>Hearing Time: 11:00 a.m. |

I, David McMullin, declare as follows:

1. I am the Chief Executive Officer of JEX Technologies Corporation, a Nevada corporation, ("**JEX**"), and I make this declaration in support of JEX's joint backup bid for substantially all of the assets of Metal Recovery Solutions, Inc. ("**MRS**" or the "**Debtor**").

2. Except for statements made "to the best of my knowledge," I make this Declaration based on my personal knowledge and review of JEX's regularly kept business records, and I am competent to testify to the facts herein. I will be attending the April 17 continued hearing on the Chapter 7 Trustee's (the "**Trustee**") Motion to Approve Sale at Docket No. 255-3 (the "**Sale Motion**") and am available to answer any questions that the Court might have regarding JEX's bid and to demonstrate its good faith.

-1-

3. For each statement that is "to the best of my knowledge," I have made a reasonable inquiry into the facts and report what I have learned from such inquiry.

**JEX and its Relationship with the Debtor**

4. As described in greater detail below, I formed JEX in July 2019 as a Nevada corporation.

5. Prior to forming JEX, I was the chief executive officer of C.S. Mining, a Delaware limited liability company, which operated a copper mine in Beaver County, Utah. During that time, C.S. Mining engaged a mining consulting company called Hard Rock Consulting ("Hard Rock") from approximately 2012 through 2016, which provided industry required consulting reports for mining operations. Mark Shonnard, a principal of Hard Rock, was my primary contact at Hard Rock.

6. In approximately 2016, the mining operations at the Utah mine were sold, and I began working as a consultant to several mining companies. At that time, to the best of my knowledge, Hard Rock, was providing consulting services to MRS. At some point in time, my understanding is that the services provided by Hard Rock to MRS were subsequently provided directly by Mark Shonnard to MRS.[1]

7. In approximately 2018, Mark Shonnard reached out to me regarding the Hydro-Jex™ Technology (the "*Technology*") and introduced me to Dr. Thom Seal.

8. In the summer of 2018, I personally entered into a mutual non-disclosure agreement with MRS and Differential Engineering, Inc. ("*Differential*") to assess a potential business relationship. A true and correct copy of the Mutual Non-Disclosure Agreement is attached hereto as Exhibit 1. At first, I provided business development consulting services to Differential and MRS

---

[1] To the best of my knowledge, Mr. Shonnard held no equity or other interest in MRS or Differential (defined herein).

-2-   *DM*   20-50660-GS

on a contract basis. In providing these services, I became familiar with the Technology and assisted in introducing the Technology to heap leaching operations in Arizona, Utah, South America, and Mexico. In early 2019, Dr. Seal approached me regarding his potential retirement, and I began negotiations with Dr. Seal regarding expanding the business relationship, including the potential to acquire the Technology.

9. During the due diligence period, I negotiated directly with Dr. Seal. I considered a joint venture with Dr. Seal and others, but ultimately determined to form JEX. I formed JEX with Mark Shonnard and George Young. George Young, to the best of my knowledge, had no connection with the Seals, MRS, or Differential prior to commencing negotiations with the same. Further, to the best of my knowledge, Hard Rock and Mark Shonnard had ceased providing any consultation services to MRS.

10. In July 2019, after extensive negotiations with Dr. Seal, JEX entered into the Lease with MRS for the two trailers and related equipment. JEX also entered into the Technology License Agreement and Technology Commercialization Agreement with Differential for an exclusive license to the Technology.

11. Because Dr. Seal is the inventor of the Technology, JEX asked Dr. Seal to serve as a consultant in its operation of the same. Dr. Seal is listed as a technology officer on JEX's website, but the title is honorary only. Neither Dr. Seal nor Jette Seal are equity owners, officers, directors, employees, or board members of JEX and neither have any control over JEX or its business operations either directly or indirectly.

12. To date, Dr. Seal has provided limited consultation to JEX's senior technical staff and management to further the Technology and improve the IP. Because the consultation services provided to date have been so limited, JEX has not provided any payment of funds to Dr. or Mrs.

Seal, but have provided nominal reimbursements to Differential (less than $2,000) for expenses for Dr. Seal to attend mining conferences.

### JEX's Bid for the Debtor's Assets

13. As described at the hearing on the Sale Motion and agreed to by the Trustee, JEX has continued to perform in good faith under the terms of the Lease. Further, JEX has accurately and consistently maintained that the Technology is not and cannot be part of the assets being sold.

14. From the inception of this case, JEX has worked to obtain financing to make an offer to purchase the assets as they are essential to the operation of JEX's business. Although JEX is a young company, at the beginning of this year, JEX determined that it could make installment payments to the Trustee for the purchase of the assets for $1.1 million. *See* Docket No. 252.

15. However, when the Trustee filed the Sale Motion with Geo-Logic Associates, Inc. ("***GLA***") as the proposed purchaser, JEX reached out to multiple investors (both current investors in JEX and potential new investors) to attempt to raise financing for a higher and better offer to purchase the assets. George Young and I spoke with these potential investors because we knew it was not a certainty that JEX would be the highest bidder.

16. One of the investors that JEX reached out to, David J. Richards, contacted Element Global, Inc. ("***Element***") and suggested that Element may be interested in purchasing the assets from the Trustee directly subject to JEX's Lease to the trailers and related equipment.

17. Element indirectly owns a minority interest in JEX (less than 0.5%), which it acquired in 2020 and 2021. JEX also reached out to Element regarding potential investment opportunities with JEX in early 2023, but no additional investments have been made at this time.

18. I informed Mr. Richards that JEX intended to bid at the Auction. I also informed Mr. Richards that if JEX was not the successful bidder, JEX's position was and is that JEX maintains all its rights under the Lease and that the Technology is not part of the assets being sold.

19. Mr. Richards subsequently informed me about a week before the auction that Element would be participating. Mr. Richards and I discussed that if Element was the successful bidder, Element would likely take the assets subject to the Lease and that there may be future business opportunities, including an investment in JEX, by Element. However, JEX does not yet have any agreement about future business opportunities.

20. Prior to the Auction, JEX's counsel spoke with the Trustee about purchasing only certain assets, specifically the trailers and related equipment, and potentially submitting a joint bid with Dr. Seal, and prior to filing JEX's Response to the Trustee's Sale Motion, JEX submitted a bid for the assets of $1.2 million to be payable within five days of a final, non-appealable order. In JEX's Response, JEX also reserved its rights to submit any overbids for all or a portion of the Debtors' assets. Without waiving any privilege, counsel for JEX was acting at my direction in connection with the foregoing.

21. JEX actively participated at the Auction. During the Auction, I, through counsel, spoke with Dr. Seal, through his counsel, regarding a joint bid, and I agreed on behalf of JEX to submit a joint bid with Dr. Seal for $2.45 million, with Dr. Seal contributing $150,000 and JEX contributing $2.3 million. Prior to submitting the backup bid, JEX's counsel communicated with the Trustee that a joint bid with Dr. Seal would be acceptable to the Trustee.

### JEX's Good Faith

22. JEX has acted entirely in good faith throughout the Auction process. JEX's actions have been calculated to advance our bid for the Debtor's assets, not to impede other parties' bids or inhibit the bidding process.

23. No agreements or promises of cash or other value were or have been made to secure MRS's or the Trustee's support of JEX in the Auction process. Neither I, nor, to the best of my

knowledge, any officer or employee of JEX asked the Trustee or the Debtor, at any point in time, to do anything that would interfere with the Auction process or the closing of another transaction.

24. No agreement or promises of cash or other value were or have been made to secure the Debtor's or Trustee's support of JEX in the Auction process, other than the prospect of resolving the adversary proceeding between the Trustee and Differential, the Seals, and Mr. Shonnard. Neither I, nor, to the best of my knowledge, any officer or employee of JEX asked these parties, at any point in time, to do anything that would interfere with the Auction process or the closing of another transaction.

25. No agreements or promises of cash or other value were made to secure Element Global's support of JEX in the Auction process, except as disclosed above. Neither I, nor, to the best of my knowledge, any officer or employee of JEX asked Element Global to do anything that would interfere with the Auction process or the closing of another transaction, nor does JEX have any understanding or agreement with Element Global that is intended to affect the price paid for the assets by JEX or Element Global or another party for the assets.

26. Based on my capacity with JEX, I believe that I would be aware of any understanding or agreement that might exist and that would be contrary to the statements in the foregoing paragraphs 20-23 of this Declaration.

[*Remainder of page intentionally left blank*]

4895-1406-3708.2

*DM*

Under penalty of perjury, I declare that I have read the foregoing and believe that it is accurate and true.

DATED this 12th day of April, 2023.

By: _____
DAVID MCMULLIN
Chief Executive Officer of JEX Technology Corp.

4895-1406-3708.2